731 F.2d 768
 MISSION BAY CAMPLAND, INC., a Delaware Corporation, Plaintiff,
v.
SUMNER FINANCIAL CORPORATION, a Florida Corporation; and
John C. Sumner, Defendants-Appellees, Cross-Appellants,
Peninsular Life Ins. Co., a Florida Corporation and Penn
Enterprises, Inc., a Florida Corporation,
Involuntary Plaintiffs-Counterclaim
Defendants-Appellants, Cross-Appellees.
 No. 82-5615.
 United States Court of Appeals,
Eleventh Circuit.
 May 7, 1984.
 
 John F. Corrigan, Jacksonville, Fla., for involuntary plaintiffs-counterclaim defendants-appellants, cross-appellees.
 C. Harris Dittmar, Bedell, Bedell, Dittmar & Zehmer, P.A., Charles P. Pillans, III, Jacksonville, Fla., for defendants-appellees, cross-appellants.
 Appeals from the United States District Court for the Middle District of Florida.
 Before ANDERSON and CLARK, Circuit Judges, and DUMBAULD*, District Judge.
 CLARK, Circuit Judge:
 
 
 1
 This appeal arises out of a diversity action brought by Sumner Financial Corporation (SFC), a Florida corporation, to collect a judgment it holds against Mission Bay Campland, Inc. (MBC), a Delaware corporation. After securing a judgment on a promissory note from MBC, SFC brought supplementary proceedings seeking to implead appellants, Peninsular Life Insurance Company (Peninsular) and its wholly owned subsidiary, Penn Enterprises, Inc. (Penn), in order to challenge appellants' foreclosure and transfer of MBC's assets as a fraudulent conveyance. The district court implead appellants and on March 31, 1982, adopted the special master's recommended holding that the foreclosure and transfer were fraudulent and that proceeds from the sale of MBC's assets transferred from Peninsular to Penn be traced and treated as property of MBC upon which SFC may execute its judgment. On April 22, 1982, the district court entered final judgment in these supplementary proceedings awarding SFC $86,936.62, plus $56,063.17 as interest and $1,542.44 as costs, for a total of $144,542.23. The court, however, denied SFC's request for attorney's fees. Appellants appeal from this final judgment, and SFC cross-appeals the denial of attorney's fees. We have jurisdiction. 28 U.S.C. Sec. 1291.
 
 Background
 
 2
 In November 1967, the city of San Diego executed a lease to a construction company controlled by Yale Willis, granting the company the right to develop a campland. To finance the project, Willis and a group headed by Lammont Dupont Copeland formed MBC. Willis' company then assigned its leasehold to MBC. After MBC was formed, Peninsular became involved in the MBC project. At Copeland's instance, Peninsular agreed to purchase MBC's $1.5 million note from its initial lender, U.S. National Bank of San Diego ("U.S. National"). Under the terms of this "take-out" agreement, Peninsular would purchase the note by December 31, 1969. The note was secured by (1) a deed of trust covering the leasehold granted by the city of San Diego and assigned to MBC from Willis' construction company for the purpose of campland development, (2) a security agreement pledging various items of MBC's tangible and intangible property, (3) a collateral assignment of MBC's interest under the lease, and (4) Mr. Copeland's personal guarantee of full payment and a pledge of his 47% stock interest in MBC. Additionally, Peninsular received a $75,000 commitment fee and a 15% equity interest in MBC. At the closing of the $1.5 million take-out agreement on February 14, 1969, SFC served as loan broker, for which SFC received as compensation an unsecured promissory note in the amount of $60,000.
 
 
 3
 By late 1969, Peninsular's financial involvement in the campland had become increasingly burdensome. First, Peninsular was committed to purchase the $1.5 million note from U.S. National to MBC by December 31, 1969. Second, although Peninsular recognized from the outset that MBC was a risky, speculative venture and that additional funds would be needed to finance construction, Peninsular expected these additional funds to come from Copeland. After the closing of Peninsular's $1.5 million "loan" to MBC, however, Copeland suffered financial reverses and was unable to arrange additional financing as expected by Peninsular. To compensate for Copeland's lack of support, Peninsular, having already committed itself to the extent of $1.5 million, would have to arrange for additional financing in order to protect its initial $1.5 million.
 
 
 4
 To secure these finances, Peninsular entered into an agreement with Copeland and Fidelity Mortgage Investors (FMI), a real estate investment trust dominated and controlled by Peninsular. Rather than foreclose on its $1.5 million deed of trust covering the leasehold interest, Peninsular received Copeland's 47% equity interest in MBC, vesting it with over 60% of the corporation's stock. (R. at 552). Copeland, in turn, was released from his personal guarantee. This exchange gave Peninsular the opportunity to participate in the profits if the MBC campland venture was successful. Furthermore, with 60% of MBC's stock, Peninsular took control of the corporation by electing its own nominees as officers and directors.[1] As part of the same transaction, Peninsular acquired the needed financial backing by arranging for FMI to fund an additional $1 million to MBC and to purchase the $1.5 million note from U.S. National, which Peninsular was obligated to purchase under the take-out agreement, until Peninsular was financially able to repurchase it from FMI.[2] The additional million dollars was essential for the continued operation of MBC and was in reality capitalization, as will be discussed later.[3]
 
 
 5
 Despite Peninsular's efforts, MBC's financial difficulties continued. MBC never operated at a profit and, as of March 31, 1970, MBC had a net loss of $127,816.64, and an accumulated deficit in retained earnings of $132,243. (R. at 554). Peninsular also had difficulty in supervising Willis, the camp manager. Willis overextended the project financially, and failed to report fiscal and other information about the camp's operations.
 
 
 6
 On July 20, 1970, MBC instituted suit in the U.S. District Court for the Middle District of Florida against SFC, seeking a judgment declaring void the note from MBC to SFC. This note was for SFC's loan broker services at Peninsular's original $1.5 million loan closing. SFC counterclaimed on the note, and on June 21, 1971, the district court directed a verdict against MBC upon all counts of its complaint, and in favor of SFC on its counterclaim. On July 16, 1971, final judgment was entered in favor of SFC in the amount of $86,936.62.
 
 
 7
 SFC then began its efforts to discover assets of MBC upon which it could levy to satisfy its judgment. Appellants, however, took action to protect their investments in MBC from SFC's judgment. Eventually, appellants deemed it necessary to foreclose on both the $1.5 million and $1 million "loans" from Peninsular and FMI to MBC. Later that year, Peninsular elected to foreclose by nonjudicial proceedings allowed under California law. Having been advised by counsel that SFC had not recorded its judgment or a request for notice, Peninsular did not notify SFC of the foreclosure sale. (R. 569). The foreclosure sale on the $1 million loan occurred on December 21, 1972, and on January 10, 1973, foreclosure on the $1.5 million loan took place. Peninsular acquired all of MBC's property through the foreclosures. No cash changed hands, however, because Peninsular bid against the amount secured by security agreements covering MBC's outstanding indebtedness.
 
 
 8
 Anticipating Peninsular's acquisition of MBC's assets, Wilbur, Peninsular's counsel, on January 5, 1973, organized Mission Bay, Inc. (MBI) to receive the assets. Ninety shares of MBI stock were issued to Penn and ten shares were issued to Wilbur. In December 1973, the city of San Diego approved the transfer of MBC's assets by Peninsular to MBI. On January 1, 1974, Peninsular transferred the campland assets to MBI in exchange for MBI's $2.5 million note and deed of trust.
 
 
 9
 On June 2, 1976, the district court, on appellees' motion, issued its order requiring Peninsular and Penn Enterprises to show cause why the campland assets in their possession or control should not be declared fraudulently acquired, the transfer voided and those assets levied upon to satisfy SFC's judgment (R. 333). Thereafter, without notice to the court or to SFC, Peninsular sold the MBC assets to DeAnza Harbor, Inc. On February 22, 1980, the special master filed his report (R. 548-92), recommending a holding that the foreclosures and transfer were ineffective against SFC and, because the assets had been sold, that a judgment be entered against Peninsular and Penn Enterprises in favor of SFC in the amount of the original judgment plus interest from July 16, 1971, together with all costs incurred by SFC in collecting its judgment (R. 592). Peninsular filed objections to the special master's report (R. 594-602) and SFC filed motions for judgment in accordance with the findings and conclusions and for attorneys' fees (R. 603-04). On March 31, 1982, the district court adopted the report as the court's opinion but denied SFC's motion for attorney's fees. On April 22, 1982, final judgment was entered. On appeal, appellants contend that the district court erred in piercing the corporate veil and ruling that (1) the $1 million loaned from FMI through Peninsular to MDC was, in reality, a contribution to capital and (2) Peninsular's foreclosure on the $2.5 million in loans to MBC and MBC's transfer of approximately $275,000 to Penn Enterprises[4] was for the purpose of hindering, delaying or defrauding creditors. On cross-appeal, SFC contends that the district court erred in denying attorney's fees.
 
 The Principal Appeal
 A. Capitalization
 
 10
 SFC argued, and the district court agreed, that Peninsular's second $1 million loan to MBC was not a "loan," but was a contribution to capital in exchange for additional ownership. By characterizing the transaction as a contribution to capital rather than as a secured loan, the district court denied Peninsular its preferred status over SFC, a judgment creditor. (See R. at 582-83). Appellant argues that the special master's conclusion, upon which the district court relied, that the second loan of $1 million from Peninsular to MBC was a contribution to capital is not supported by the underlying findings of fact.
 
 
 11
 The special master relied upon Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 239, 84 L.Ed. 281 (1939), to subordinate Peninsular's claims to MBC's assets to SFC's judgment lien. In that case, the Supreme Court said that:
 
 
 12
 So-called loans or advances by the dominant or controlling stockholder will be subordinated to claims of other creditors [including judgment creditors] and thus treated in effect as capital contributions by the stockholder ... where the paid in capital is purely nominal, the capital necessary for the scope and magnitude of the operations of the company being furnished by the stockholder as a loan.
 
 
 13
 Id. at 309-10, 60 S.Ct. at 246-47. In relying on Pepper, the special master did not attempt to establish a per se rule whereby all "shareholder loans to a corporation will be treated as contributions to capital and subordinated to the claims of other creditors," as suggested by appellants. Brief for Appellants at 20. Rather, the special master applied the test established in Matter of Multiponics, Inc., 622 F.2d 709 (5th Cir.1980):
 
 
 14
 (i) The claimant must have engaged in some type of inequitable conduct. (ii) The conduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant....
 
 
 15
 Id. at 713.
 
 
 16
 The record reveals that the special master did not misapply the Multiponics standard as contended by appellants. The special master did not invalidate the $1 million conveyance from Peninsular to MBC solely because MBC was undercapitalized. Rather, the special master articulated various attendant circumstances which indicated that, in addition to undercapitalization, Peninsular engaged in "inequitable" or "fraudulent" conduct which would justify subordination. (R. at 583-84). These findings are supported by the evidence.
 
 B. The Transfer of Funds
 
 17
 Appellants contend that the district court erred in holding that a total of approximately $275,000 transferred in part on two occasions from MBC, through Peninsular, to Penn Enterprises should be treated as belonging to the debtor (MBC) upon which SFC may execute its lien. (See R. at 591). The first transfer occurred in October 1972 in the amount of $151,361.99. At that time, the foreclosure proceedings against MBC had been initiated and Peninsular was proceeding under the apprehension that SFC would try to stall or delay the foreclosure. MBC's president, Willis, acting on instructions from Peninsular's attorney, Wilbur, opened a special trust account, deposited the approximately $150,000 generated during MBC's peak cash flow, and transmitted that sum to the trust account of Peninsular's attorney. Peninsular's attorney then transferred the entire sum to Penn Enterprises, which credited it against unsecured advances previously made by Penn to MBC. The special master found that this transfer was for the fraudulent purpose of preferring Penn Enterprises' unsecured claim over the claims of other creditors, i.e., SFC.
 
 
 18
 A debtor may convey its assets to a creditor to satisfy its antecedent debts, even if the debtor intended to defeat the claims of other creditors and the creditor had knowledge of such intention. See Miles v. Katz, 405 So.2d 750 (Fla. 4th DCA 1981). The transfer becomes fraudulent, however, if the creditor actually participates in the debtor's fraudulent purpose, provided such a purpose exists. Id. Appellants contend that the record contains no evidence that Penn Enterprises participated in any alleged fraud by MBC regarding the transfer of funds, and therefore, the transfer was not fraudulent.
 
 
 19
 The record contains sufficient facts demonstrating that the special master's findings were not clearly erroneous. The transfer of funds from MBC to Penn Enterprises was made through Peninsular, and Peninsular owned and controlled Penn Enterprises. Penn Enterprises had no employees and its only purpose was to act as a holding company for Peninsular. Indeed, Penn held the 15% and later the 60% of MBC's stock and, after the creation of MBI, it held Peninsular's 90% interest in that corporation.[5] Furthermore, although MBC paid $75,000 per year to Penn Enterprises under a "management contract," Penn performed no services, and the scheme was devised to extract funds from MBC to reimburse Peninsular for commitment fees, which Peninsular owed to FMI.[6] Although appellants dispute these facts, their contentions do not prevent us from upholding the lower court's findings under the clearly erroneous standard of review where sufficient evidence in the record supports the finding.
 
 
 20
 The second transfer occurred in October 1973, when Wilbur withdrew $125,000 from another special account he had established for the camp's 1973 revenues. Wilbur deposited the money in his law firm's account and then transferred it to Peninsular. Appellants contend that, because this transfer occurred after foreclosure and after Peninsular had acquired all of MBC's assets, SFC had no viable rights to the funds in the special account, which contained the campland's post-foreclosure profits for 1973. This argument has facial appeal but must fail in view of our determination in Part C, infra, that the foreclosure was, itself, fraudulent. To allow appellants to extinguish SFC's rights to revenues generated by the campland by virtue of a fraudulent foreclosure would be inequitable. The district court, therefore, did not err in piercing the corporate veil and permitting SFC to trace and levy on the entire $275,000.[7]
 
 C. Foreclosure Sales/Fraudulent Transfers
 
 21
 The foreclosure sales under the $1 million deed of trust and $1.5 million instrument were held on December 21, 1972 and January 10, 1973, respectively. Both sales were conducted pursuant to an agreement between Willis, MBC's president, and Peninsular, the mortgage holder. The agreement provided that MBC's assets would be transferred to a new corporation, MBI, formed before the sale solely for that purpose, and that Peninsular would have a 90% interest and Willis a 10% interest. Peninsular entered into this agreement to prevent Willis from interfering with the foreclosure. Relying on counsel's advice that SFC had not recorded its judgment or requested notice of the sales, Peninsular also avoided interference from SFC by not notifying them of the sales. (R. at 22).
 
 
 22
 The special master's report contains a detailed discussion of the "badges of fraud" which indicated that the foreclosure sales were fraudulent transfers. (R. at 32-37). Appellants contend, however, that the special master incorrectly applied the cases setting aside foreclosures as fraudulent transfers because those cases, unlike the instant case, "involve[d] either an invalid underlying loan or a defect in the actual foreclosure procedure." Br. of Appellants at 32. The appellee contends that this distinction noted by appellants is immaterial, because each case, regardless of whether the underlying loan was invalid or actual foreclosure procedure was defective, stands for the general proposition "that if a mortgagor and a mortgagee collusively participate in a foreclosure with an intent to hinder, delay or defeat other creditors, it is a fraudulent transfer." Br. for Appellee at 28.
 
 
 23
 We need not address whether appellee's broader statement of the law is correct because this case satisfies the more stringent standard urged by appellants. In Part A, supra, we upheld the special master's finding that the "loans" from Peninsular to MBC were actually contributions to capital. The instant case, therefore, involves "an invalid underlying loan."
 
 The Cross-Appeal
 
 24
 The note upon which SFC obtained its original judgment provided that, if legal proceedings were necessary to enforce any sum becoming due on the note, the "undersigned" [MBC and SFC] promise to pay reasonable attorneys' fees. The district court, however, denied SFC's request for attorney fees, and SFC has cross-appealed seeking reversal of that denial. The sole question presented is whether the contractual basis upon which to award attorneys' fees permits SFC to recover out of a fund now held by Peninsular.
 
 
 25
 SFC contends that the contractual provision in the note between SFC and MBC enables SFC to recover from the fund held by Peninsular. In support of this contention, SFC relies upon a Massachusetts case, Leventhal v. Krinsky, 325 Mass. 336, 90 N.E.2d 545 (1950). In that case, Leventhal served as guarantor on a note issued to Krinsky, secured by a mortgage on certain trailers. As relationships between the parties deteriorated, they agreed to sell the trailers and have a third party hold the proceeds until the parties' rights could be determined. Because the terms of the note provided that Krinsky could recover all legal expenses incurred in enforcing payment of the note, the court held that Krinsky was entitled to the fund held by the third party to the extent necessary to compensate him for attorneys' fees.
 
 
 26
 Appellants attempt to distinguish this case on the grounds that Leventhal was a guarantor on the note issued to Krinsky, while Peninsular was not a guarantor on the note issued from MBC to SFC. This distinction is immaterial, however, because the Leventhal court held that "[t]he fact that Leventhal has been found not liable under his guaranty for costs and expenses does not bar Krinsky from proceeding to collect and apply the proceeds of the mortgaged property to the discharge of the mortgage note." 90 N.E.2d at 548. Appellants also rely upon Codomo v. Emmanuel, 91 So.2d 653 (Fla.1956). In that case, the Florida Supreme Court denied a judgment holder's request for attorney fees pursuant to a contractual authorization of such award. The note was made by Belfran, Inc., and was endorsed by Leonard Codomo. Janet Codomo, Leonard's wife, was neither maker nor endorser of the note, but was implead into the supplemental proceedings after it was found that she was the undisclosed principal, owned most of the stock in the corporation, and was responsible for the fraud precipitated upon creditors.
 
 
 27
 Although the Codomo court disallowed an award of attorney fees against Janet, that case is distinguishable from Leventhal and the instant case. In Codomo, the court held that "there was [no] authority for the judgment against her, [personally] for the attorney's fees complained of." 91 So.2d at 655. Indeed, the Codomo court distinguished Leventhal on the grounds that the Leventhal court did not "impose personal liability against defendant," and awarded attorney's fees "from a fund held by a third party pending determination of the cause." The instant case appears more analogous to the Leventhal situation. Although SFC has a personal judgment against Peninsular, the property upon which SFC may levy to satisfy its judgment is the $275,000 which was generated by the campland and fraudulently transferred to Peninsular. The principle underlying the law of fraudulent transfers is that the creditor has a claim upon the debtor's property, constituting a fund from which the debt should be paid. See Ocklawaha River Farms Co. v. Young, 73 Fla. 159, 74 So. 644, 648 (1917). In this case, SFC was permitted to pierce the corporate veil and trace that fund from MBC to Peninsular in satisfaction of its judgment.[8] To the extent of the $275,000 fund in Peninsular's possession, SFC may recover attorneys' fees. Only if the recovery for attorneys' fees exceeded the amount of the fund would Codomo prohibit the award. Accordingly, we find that the district court erred in denying SFC an award of attorneys' fees. The case is remanded for the district court's determination of a reasonable fee, including a fee for work in this appeal.
 
 
 28
 AFFIRMED IN PART, REVERSED AND REMANDED IN PART.
 
 
 
 *
 Honorable Edward Dumbauld, U.S. District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 It should be noted that in addition to Peninsular's ability to control MBC as its principal shareholder, Peninsular also, as MBC's principal lender, could determine when and if it would foreclose in the event of MBC's financial failure. (R. at 552)
 
 
 [2]
 Peninsular's wholly owned subsidiary, Penn Enterprises, agreed to pay FMI a 4% commitment fee on the $1 million and, if Peninsular were unable to repurchase the note from FMI within 90 days, Penn agreed to pay 1% renewal fees for each extension
 
 
 [3]
 See Part A, infra
 
 
 [4]
 The facts surrounding the $275,000 transfer are set forth in Part B, infra
 
 
 [5]
 MBI was the corporation to which defunct MBC's assets were transferred
 
 
 [6]
 FMI was the lending institution owned and controlled by Peninsular which financed the second loan to MBC of $1 million
 
 
 [7]
 This result is especially appropriate in view of appellants' use of the account to pay creditors other than SFC whose rights also should have been cut off by a legitimate foreclosure. For example, in August 1973, campland funds were used to pay Wilbur's firm for services rendered to the defunct MBC
 
 
 [8]
 See Part B, supra