In re Harvey GOLDBERG, Debtor.

Daniel L. Bakst, Trustee, Plaintiff,

v.

Linda Levenson, Defendant.

Bankruptcy No. 97–35293–BKC–PGH.
Adversary No. 98–3100–BKC–PGH–A.

United States Bankruptcy Court,
S.D. Florida,
Fort Lauderdale Division.

Sept. 29, 1998.

C. Craig Eller, Gunster, Yoakley, Valdes-Fauli & Stewart, P.A., West Palm Beach, FL.

David A. Carter, Boca Raton, FL, for Debtor.

Daniel Bakst, Bakst, Cloyd & Bakst, P.A., West Palm Beach, FL, Trustee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON TRUSTEE'S AMENDED COMPLAINT TO SET ASIDE FRAUDULENT TRANSFERS, TO REQUIRE ACCOUNTING AND FOR TURNOVER PURSUANT TO 11 U.S.C. §§ 544, 547, 548 AND FLORIDA STATUTES CHAPTER 726

PAUL G. HYMAN, Jr., Bankruptcy Judge.

**THIS MATTER** came before the Court for trial on August 7, 1998. Daniel L. Bakst, Trustee filed an amended adversary complaint which seeks to avoid and recover fraudulent conveyances pursuant to 11 U.S.C. §§ 544, 548 and Florida Statutes §§ 726.101, 726.105(1)(a), 726.105(1)(b), 726.106(1), and alternatively, to avoid and recover a preferential transfer pursuant to 11 U.S.C. § 547. This Court, having observed the demeanor of the witnesses, reviewed the exhibits and testimony presented, considered the argument of counsel, and being otherwise fully advised in the premises, enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

On October 23, 1997, Harvey Goldberg (the "Debtor") filed a Voluntary Petition under Chapter 7 of the Bankruptcy Code. Daniel Bakst (the "Trustee") was appointed as Chapter 7 Trustee in the Debtor's bankruptcy case. The Trustee filed a complaint against Linda Levenson ("Levenson"), the Debtor's fiancee, on April 22, 1998. That complaint was later amended on July 8, 1998 to assert causes of action based upon fraudulent transfers under Section 548 of the Bankruptcy Code, upon a preferential transfer under Section 547 of the Bankruptcy Code, and upon fraudulent transfers under Florida Statutes §§ 727.105(1)(a) and (1)(b), and 726.106(1). See Fla.Stat. §§ 727.105(1)(a) and (1)(b) and 726.106(1) (1997).

The Trustee's Amended Complaint alleges that the following three transfers between Levenson and the Debtor should be avoided:

(1) A payment of $80,000 to Levenson on August 8, 1994;

(2) A payment of $50,000 to Levenson on April 21, 1995; and

(3) Transfer of a standard equity membership (the "Membership") in Woodfield Country Club ("Woodfield") on March 21, 1996.

Levenson and the Trustee have stipulated that these transfers occurred and that the Debtor was insolvent at the time the transfers took place.

The Debtor purchased his home at 3005 Hampton Circle, Boca Raton, Florida (the "Real Property") on January 31, 1994. The Real Property is located within Woodfield. It is undisputed that the Real Property was the Debtor's homestead and was exempt at all times relevant to the allegations contained in the Amended Complaint.

The Debtor testified that in the summer of 1994, he was planning on buying a business in South Florida known as the Deli Place. In June 1994, a Florida corporation named

IBF Foods, Inc. ("IBF") was formed to purchase and operate the Deli Place. Irene Goldberg, the Debtor's mother, is IBF's president and the registered owner of 100% of IBF's stock. Levenson and the Debtor are IBF's vice presidents. Although Ms. Goldberg is the registered owner of the stock of IBF, she testified at trial that the Debtor owned IBF.

Prior to the purchase of the Deli Place, the Debtor had enough assets in an investment account to pay the $120,000 required as the down payment for the business. The Debtor testified that during his trip to South Florida to attend the closing of the purchase of the business, his stock portfolio lost value to such an extent that he was unable to close on the business. Levenson offered to lend the Debtor enough money to close on the business so that he would not lose the business opportunity. At the Debtor's request, Levenson transferred $120,000 directly from her bank account into IBF's account on July 29, 1994. On the same date, the Debtor executed a promissory note (the "Promissory Note") for $120,000 to Levenson on behalf of IBF and himself, personally. The $120,000 was then used to purchase the business. The Promissory Note provided that Levenson would be repaid by the Debtor's refinancing of the mortgage on the Real Property on or before August 15, 1994. Levenson and the Debtor presented substantial evidence at the trial concerning various other loans Levenson had made to the Debtor from March 1994 to the present. This evidence consisted of promissory notes executed by the Debtor, canceled checks, wire transfer receipts, and the testimony of Levenson. The evidence indicated that: (1) between March, 1994 and May, 1994, Levenson loaned the Debtor $10,000; (2) in February, 1995, Levenson loaned the Debtor $6,000 in cash; (3) in March, 1995, Levenson loaned the Debtor $3,000 in cash; and (4) in April, 1995, Levenson loaned the Debtor $2,000.

On August 8, 1994, the Debtor refinanced his mortgage on the Real Property and transferred $80,000 of the loan proceeds from Great Western Bank directly to Levenson through the trust account of Samsi Caliendo. The $80,000 was not commingled with any of the Debtor's other funds. The Debtor also transferred $50,000 to Levenson on April 21, 1995 from the proceeds of a $100,000 loan from Joan Prince ("Prince") for which Prince was granted a second mortgage on the Real Property. Again, the $50,000 was transferred directly to Levenson from the closing agent and was not commingled with any of the Debtor's other funds.

On December 10, 1995, the Debtor executed a quit-claim deed transferring the Real Property from himself to Levenson and himself as joint tenants with the right of survivorship. Levenson and the Debtor testified that the transfer of the Real Property was based upon the advice of tax counsel relating to deduction of mortgage interest on the Real Property. Levenson also testified that she lent the Debtor substantial monies from October, 1995 until March, 1997 for real estate taxes, mortgage payments, utility bills, cable bills, phone bills and the Membership fees related to the Real Property. However, the Court finds that the monies given to the Debtor to pay expenses related to the Real Property, after the Debtor transferred a joint interest in the Real Property to Levenson, were not loans to the Debtor, but were either payments of expenses that benefitted Levenson as co-owner or payments of her own living expenses.

On March 16, 1996, the Debtor sent a letter to Woodfield requesting that the Membership be transferred to Levenson. The Debtor testified that he transferred the Membership to Levenson to repay her for loans she made to him. In exchange for the Membership, Levenson testified that she gave the Debtor $20,000 credit toward the funds she had previously lent to the Debtor. On March 21, 1996, Woodfield executed and delivered to Levenson a membership certificate issued in her name representing ownership of the Membership.

John Csapo ("Csapo"), the Project Manager for Development of Woodfield, testified that in order to be eligible for membership in Woodfield, a person must first own real property within the confines of Woodfield. Csapo testified that the transfer of the Membership to Levenson was appropriate because she

was an owner of the Real Property in Woodfield.

On March 14, 1997, Levenson quit-claimed her interest in the Real Property back to the Debtor. The Debtor and Levenson testified that Levenson transferred the Real Property back to the Debtor in order to protect Levenson from becoming embroiled in the disputes between the Debtor and his creditors. During this period, although Levenson knew there were creditors making claims against the Debtor, the Debtor testified that he did not inform Levenson of specific details concerning these claims, except perhaps the Debtor's ex-wife's claim which was disputed. However, Levenson testified that she was aware of a garnishment instituted by Kobrin on January 30, 1997, and that she made additional loans to the Debtor in order to provide him support after the garnishment.

In the early part of 1996, Levenson requested that Woodfield sell the Membership. Upon Woodfield's sale of the Membership to a third party, Woodfield issued a check to Levenson on August 7, 1997 in the amount of $22,946.73 representing the proceeds of the sale of the Membership. On August 11, 1997, Levenson lent $22,946.73 to IBF.

Csapo testified that when Levenson quit-claimed the Real Property back to the Debtor, the Membership did not automatically revert back to the Debtor. Csapo also testified that regardless of whether property holders sell their real property within Woodfield or sells their membership in Woodfield, the effect is the same: the membership goes into a pool for resale and the proceeds of the sale are paid to the membership holder. Csapo further testified that under no circumstances would the proceeds of the sale of the Membership have been paid to the Debtor unless Levenson had instructed Woodfield to transfer the Membership back to him.

The Debtor was involved in two prior bankruptcy cases. The first involved Middle Atlantic Sports Co., Inc., a/k/a MASCO Sports ("Masco"). Masco filed a Chapter 11 bankruptcy in the late 1980's, through which Masco was sold. The second was his personal Chapter 7 bankruptcy case, filed in January of 1991, that the Debtor personally filed due, at least in part, to the failure of Masco.

The Debtor did not list all of his creditors in his prior personal bankruptcy case. A year after the case was closed, the Debtor requested that his case be reopened in order to add creditors so as to discharge the debts. Several creditors fought this attempt and the bankruptcy court denied the Debtor's request. Thereafter, several creditors brought suit against the Debtor in 1993 and obtained judgments against him. Seymour Kobrin ("Kobrin"), obtained a judgment against the Debtor in the amount of $243,789.88 on March 19, 1996, and Susan Ottinger ("Ottinger") obtained a judgment against the Debtor in the amount of $326,880.41 on April 11, 1996. Levenson testified that she was aware of a previous bankruptcy involving Masco and of the Debtor's efforts to reopen his bankruptcy case, although she was not clear that there were two separate cases.

### CONCLUSIONS OF LAW

The Court has jurisdiction over this subject matter pursuant to 28 U.S.C. §§ 157 and 1334(b). The parties have stipulated that this is a core proceeding for which the Court may enter appropriate orders and judgments in accordance with 28 U.S.C. §§ 157(b)(2)(H) and (J).

### I. CLAIMS UNDER 11 U.S.C. § 547 ARE TIME–BARRED.

■ Section 547(b) of the Bankruptcy Code permits a trustee to avoid certain pre-bankruptcy transfers as preferences. A preferential transfer under 11 U.S.C. § 547 must be made either within 90 days before the filing of the petition in bankruptcy or between ninety days and one year before the date of the filing of the petition if the creditor receiving the transfer was an insider. See 11 U.S.C. § 547(b). The Trustee argues that the transfer of the Membership to Levenson occurred within the statutory period. However, the Trustee's argument is without merit because the Membership was transferred outside of the statutory period and is thus time-barred.

■ Florida law provides the proper date for determining the date upon which a transfer occurs. In the case of *Gennet v.*

*Docktor (In re Levy)*, 185 B.R. 378, 382 (Bankr.S.D.Fla.1995), the Court found "[i]t is clear that, for the purposes of determining the time of an alleged fraudulent or preferential transfer, state law governs the time of perfection of such a transfer." Under Florida law, a country club membership is an interest in intangible personal property. *See Appleby v. Nolte*, 682 So.2d 1140, 1142 (Fla. 4th Dist.Ct.App.1996) (finding that for purposes of determining ad valorem tax rates, a country club membership constitutes intangible personal property).[1] A transfer of personal property occurs at the time when all of the steps necessary to effectuate the transfer have occurred. *See* Fla.Stat. § 679.203(1)(a) (1997). According to the Woodfield bylaws, the issuance of the membership certificate must occur in order to effectuate a transfer of a membership. The issuance of the membership certificate to Levenson occurred on March 21, 1996. The date the membership certificate was issued is the date the transfer of the ownership interest in the Membership was effective, not the date when Levenson received the proceeds from the sale of the Membership. Therefore, the Court finds that the transfer of the Membership occurred on March 21, 1996, and thus falls outside of the statutory period under 11 U.S.C. § 547(b).

## II. CLAIMS UNDER 11 U.S.C. § 548 ARE TIME–BARRED.

Section 548 allows the Trustee to avoid a debtor's transfer in interest of the property of the debtor that was made or incurred within one year before the commencement of the bankruptcy case and that depletes the debtor's assets to the detriment of the bankruptcy estate. *See* 11 U.S.C. § 548(a). In the instant case, the transfer of the Membership did not take place within the required one year period, as explained more fully above. As such, this Court finds that the Trustee's claim based upon fraudulent transfers under § 548 of the Bankruptcy Code is also time-barred.[2]

## III. THE TRANSFERS OF $80,000 AND $50,000 ARE EXEMPT AS PROCEEDS OF HOMESTEAD PROPERTY UNDER FLORIDA LAW.

The unrebutted evidence at trial indicated that the $80,000 and $50,000 transfers were proceeds of loans generated by the equity in the Debtor's Real Property. It is undisputed that the Real Property was the Debtor's homestead and thus exempt. Prior to both the $80,000 and the $50,000 transfers, the Debtor granted mortgage liens on his homestead to the lender and the proceeds of the loans were delivered directly to Levenson without being commingled with any of the Debtor's other assets. The Debtor, as a matter of law, could not have formulated the fraudulent intent necessary to commit a fraudulent transfer if the source of the transfer is an exempt asset absent a commingling of the funds with nonexempt assets. Moreover, because the source of the proceeds was exempt property, the proceeds were out of the reach of creditors as a matter of law. In *Sneed v. Davis*, 135 Fla. 271, 184 So. 865, 868 (Fla.1938), the Florida Supreme Court stated:

according to the weight of authority a debtor in disposing of property can commit a fraud on creditors only by disposing of such property as the creditor has a legal right to look to for satisfaction of his claim, and hence a sale, gift, or other disposition of property which is by law absolutely exempt from the payment of the owner's debts cannot be impeached by creditors as in fraud of their rights. Creditors have no right to complain of dealings with property

---

1. Levenson argued, in error, that the Membership was a certificated share under Florida Statutes § 678.102(1)(a). *See* Fla.Stat. § 678.102(1)(a) (1997). The Court finds that the Membership is not a certificated security within the meaning of that statutory language which generally references stocks dealt in a securities exchange.

2. As indicated, the Trustee also asserts fraudulent conveyance claims under the Florida Uniform Fraudulent Transfer Act, specifically, Florida Statutes §§ 726.105(1)(a), 726.105(1)(b), and 726.106 with respect to all three transfers. Under Florida Statutes § 726.110, these claims are not time-barred because the statute of limitations for these statutes is four years from the date the transfer was made. *See* Fla.Stat. § 726.110 (1997).

which the law does not allow them to apply on their claims, even though such dealings are with a purpose to hinder, delay, or defraud them.

*See also Malone v. Short (In re Short)*, 188 B.R. 857 (Bankr.M.D.Fla.1995) (finding that, as a matter of law, a transfer of exempt property could not be avoided as having been made with the intent to hinder, delay, or defraud creditors either under § 548 of the Bankruptcy Code or Florida Statutes § 726.105); *Tavormina v. Robinett (In re Robinett)*, 47 B.R. 591 (Bankr.S.D.Fla.1985) (finding that if the property in question was exempt from the claims of creditors on the date of the transfer, then § 548 is inapplicable, as the transfer of exempt property cannot adversely affect any creditor and, therefore, cannot be a fraudulent transfer); *Rigby v. Middlebrooks*, 102 Fla. 148, 135 So. 563, 564 (Fla.1931) ("As to exempt property there are no creditors within the meaning of statutes prohibiting the conveyance of property in fraud of creditors, and, as homesteads are exempt from execution, a creditor acquires no rights in regard thereto."); *Spoonholtz v. Spoonholtz*, 180 So.2d 497, 500 (Fla.3d Dist. Ct.App.1965) (finding that a husband's transfer of a homestead to a wife could not have been a fraudulent conveyance under Florida law. "Since homestead property is not subject to the attacks of creditors there can be no fraud connected with this transfer.").

The Trustee argues that although the proceeds may have been exempt, they lost their exempt status once they were no longer intended for the use of homestead property. The Trustee cites the case of *Orange Brevard Plumbing & Heating Co. v. La Croix*, 137 So.2d 201 (Fla.1962), for the proposition that once homestead property is converted into another form, it loses its exempt status unless reinvested into another homestead within a reasonable period of time. In *Orange Brevard*, the Florida Supreme Court held as follows:

> we hold the proceeds of a voluntary sale of a homestead to be exempt from the claims of creditors just as the homestead itself is exempt if, and only if, the vendor shows, by a preponderance of the evidence an abiding good faith intention prior to and at the time of the sale of the homestead to reinvest the proceeds thereof in another homestead within a reasonable time.... The proceeds of the sale are not exempt if they are not reinvested in another homestead in a reasonable time or if they are held for the general purposes of the vendor.

*Id.* at 205.

The facts in *Orange Brevard* are distinguishable from the facts in the case at bar. *Orange Brevard* was not a fraudulent transfer case but involved garnishment of proceeds of the debtor's homestead being held by a third party. The issue before the court was whether the debtor had a good faith intention to reinvest the funds into a homestead within a reasonable period of time. Here, upon transfer to Levenson, the Debtor retained no interest in the funds generated by the loans against his homestead and never had possession of the funds since they were delivered directly to Levenson. Moreover, the Debtor did not sell his homestead. The Debtor merely mortgaged and refinanced his homestead, encumbering the Real Property with liens that must be satisfied upon its sale. Mortgage and refinance proceeds are not the functional equivalent of sale proceeds. Thus, the fact that the Debtor did not reinvest the proceeds or have the requisite intent to reinvest the proceeds into another homestead within a reasonable period of time is irrelevant. The Court finds that no creditor could have forced the Debtor to mortgage his homestead to satisfy its claims. Thus, the Debtor's creditors were not harmed and there was not, nor could there be, any fraudulent intent on the part of the Debtor.

The Trustee also cites *Roemelmeyer v. Vidana (In re Vidana)*, 19 B.R. 787 (Bankr.S.D.Fla.1982) in support of his position. *Vidana* is likewise distinguishable. In *Vidana*, the debtor transferred his homestead to his daughter, for no consideration, who immediately sold the property, paid off the mortgage and broker's fee, gave $5,000 to the debtor's wife, and retained $42,586. *See id.* at 788. The bankruptcy court concluded that the debtor's daughter was merely the debtor's alter ego or straw man in a plan to convert the debtor's homestead into cash and secrete the debtor's share of the proceeds. *See id.* In the instant case, the Debtor did not sell his homestead. There was no evidence that the Debtor retained any interest

in the proceeds, that they were paid to Levenson for any purpose other than to repay loans she made to the Debtor, or that he commingled any of the proceeds. Furthermore, the mortgages encumbered his homestead property to which creditors would have had no claim whether it was encumbered or not. Thus, as a matter of law, the Debtor could not have fraudulently transferred his exempt assets because under Florida law, "a homestead cannot be fraudulently transferred." *In re Levy,* 185 B.R. 378, 386 (Bankr.S.D.Fla.1995). Accordingly, the Court finds in favor of Levenson with respect to the Trustee's claim that the Debtor's transfers of $80,000 and $50,000 were fraudulent conveyances under Florida law. Because the Court has found that the $80,000 and $50,000 transfers could not be fraudulent conveyances as a matter of law, the state law fraudulent transfer claims asserted by the Trustee are moot and will not be addressed.

## IV. THE TRANSFER OF THE MEMBERSHIP IS NOT VOIDABLE UNDER § 726.106(1) OR § 726.105(1)(b) BECAUSE THE DEBTOR RECEIVED REASONABLY EQUIVALENT VALUE UNDER § 726.104(1).

■ Florida Statutes §§ 726.105(1)(b) [3] and 726.106(1) [4] deal with transfers made by a debtor without receiving reasonably equivalent value in exchange for the obligation while the debtor was insolvent or intended to incur or believed or should have believed that he or she would incur debts beyond his or her ability to pay as they became due. Because Levenson has stipulated that the Debtor was insolvent at the time of the transfer of the Membership, the Court's analysis under these claims is limited to whether the Debtor received reasonably equivalent value in exchange for the transfer.

3. Set forth in full, *infra,* at footnote 6.

4. Florida Statute § 726.106(1), provides:
 A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation.

■ Section 726.104(1) specifically defines value to include the satisfaction of an antecedent debt.[5] Both Levenson's and the Debtor's unrebutted testimony indicated that at the time the Membership was transferred, Levenson was owed $23,000 on the loans she had previously made to the Debtor between March, 1994 and April, 1995. The Debtor and Levenson also testified that Levenson gave the Debtor a $20,000 credit against his loan balance in exchange for the transfer of the Membership. Under Florida law, an insolvent debtor may make a valid conveyance of property to a creditor for the purpose of either securing or discharging a pre-existing debt, but for such a conveyance to be valid there must be an agreement at the time between the parties that the conveyance shall discharge the debt. *See Jones v. Wear,* 111 Fla. 69, 149 So. 345, 347 (Fla.1933); *accord Gennet v. Docktor (In re Levy),* 185 B.R. 378 (Bankr.S.D.Fla.1995) (finding that the existence and payment of a pre-existing debt constitutes reasonably equivalent value and thus precludes the finding and avoiding of a fraudulent transfer under 11 U.S.C. § 548).

■ The Eleventh Circuit standard for determining reasonably equivalent value was set forth in *Walker v. Littleton (In re Littleton),* 888 F.2d 90 (11th Cir.1989) wherein the court stated that a determination of reasonable equivalence must be based upon all the facts and circumstances of each case and is not capable of precise computation. *See id.* at 93. However, despite this pragmatic approach, the court nonetheless validated the 70% rule, set forth by the Fifth Circuit in *Durrett v. Washington Nat'l Ins. Co.,* as providing a useful guideline by which the bankruptcy court may evaluate the fairness of a transfer and the requirement of reasonably equivalent value. *See id.* (citing *Durrett*

*See* Fla.Stat. § 726.106(1) (1997).

5. Section 726.104 defines "Value" as:
 (1) Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person. *See* Fla.Stat. § 726.104(1) (1997).

*v. Washington Nat'l Ins. Co.*, 621 F.2d 201 (5th Cir.1980)). Because in *Durrett*, the Fifth Circuit stated in dictum that all transfers for less than 70% of market vale were avoidable under the bankruptcy code, the Eleventh Circuit adopted the 70% rule as a guideline and not as a requirement. *See id.* In the case at bar, Levenson gave the Debtor $20,000 credit towards his antecedent debts in exchange of the transfer of the Membership. This was 87.2% of the amount Levenson subsequently received upon the sale of the Membership. Based upon the facts and circumstances of this case and the value of the Membership falling above the 70% guideline adhered to in this Circuit, the Court finds that the $20,000 credit constitutes reasonably equivalent value for the transfer of the Membership within the meaning of Florida Statutes §§ 726.105(1)(b) and 726.106(1). Therefore, the transfer of the Membership was not a fraudulent conveyance within the purview of §§ 726.105(1)(b) and 726.106(1).

## V. THE TRANSFER OF THE MEMBERSHIP IS VOIDABLE UNDER § 726.105(1)(a).

 Under § 726.105(1)(a)[6], the Court finds that the transfer of the Membership was made with the actual intent to hinder, delay, or defraud creditors of the Debtor. Under § 726.105(2), the Florida Legislature provides a list of factors, commonly referred to as badges of fraud, that a Court may use in determining whether a debtor acted with actual intent. "While a single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance ... several of them when considered together may afford a basis to infer fraud." *General Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1498 (11th Cir. 1997) (citing *Johnson v. Dowell*, 592 So.2d 1194, 1197 (Fla.2d Dist.Ct.App.1992)). The Court finds that several of these factors are met here. A nonexclusive list includes the following: (1) the transfer was to an insider,[7] § 726.105(2)(a); (2) before the transfer was made or obligation incurred, the debtor had been sued or threatened with suit,[8] § 726.105(2)(d); (3) the transfer was of substantially all of the debtor's assets,[9] § 726.105(2)(e); (4) the debtor was insolvent; and (5) the debtor removed or concealed assets,[10] § 726.105(2)(g). Based upon these badges of fraud, the Court finds that the Debtor transferred the Membership to Levenson with the intent to hinder, delay, or defraud his creditors under § 726.105(1)(a).

## VI. THE TRANSFER OF THE MEMBERSHIP IS NOT PROTECTED UNDER THE STATUTORY DEFENSE OF § 726.109(1).

 Even if a transfer is deemed a fraudulent conveyance under § 726.105(1)(a),

---

6. Florida Statutes § 726.105, provides:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (a) with actual intent to hinder, delay, or defraud any creditor of the debtor, or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (I) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

See Fla.Stat. § 726.105 (1997).

7. Although Levenson did not qualify as a relative of the Debtor because she was only engaged to him, many courts have broadly construed the definition of insider for purposes of fraudulent transfer actions. *See In re Levy*, 185 B.R. 378,

384 (Bankr.S.D.Fla.1995). The Court agrees with this holding and finds that Levenson's status as the Debtor's fiancee is equivalent to an insider.

8. Although many of the Debtor's debts existed since the 1980's, the Debtor requested that the Membership be transferred to Levenson on March 18, 1996, and the Membership was actually registered in her name on March 21, 1996. The Kobrin judgment was entered on March 19, 1996 and the Ottinger judgment was entered on April 11, 1996.

9. The Membership was the only asset that the Debtor owned of any value at the time he transferred it to Levenson, other than his home.

10. The Debtor admitted at trial that he opened banking accounts under the names of family members in order to protect his money from his creditors. He also titled the stock of IBF in his mother's name even though at trial his mother stated that the Debtor owned IBF.

the transfer may not be voidable if the criteria for the statutory defense in § 726.109(1) are met. The statutory defense applies when the transferee takes in good faith and for a reasonably equivalent value. As indicated above, the evidence presented showed that Levenson, the transferee, took the transfer for reasonably equivalent value when she received the Membership. Thus, the Court's analysis hinges on whether Levenson took the Membership in good faith.

Florida courts have outlined the parameters of good faith. For example, in *Miles v. Katz*, 405 So.2d 750, 751 (Fla. 4th Dist.Ct. App.1981), the Fourth District Court of Appeal found that a preferred creditor can have knowledge that the debtor is insolvent, that there are other creditors, that the debtor is transferring the assets in an attempt to defraud his own creditors, and that the effect of the transfer of the asset will be to defeat his creditors claims. Despite this breadth of knowledge of the debtor's affairs, the preferred creditor's preferential transfer will not be voidable unless the preferred creditor (1) took the conveyance for the purpose of aiding in the fraud, or (2) actively participated in the debtor's fraudulent purpose to defeat the claims of other creditors. *See id.*; *Malloy v. United States*, 743 F.Supp. 834, 837 (S.D.Fla. 1990); *Nelson v. Spiegel*, 529 So.2d 311, 312 (Fla.4th Dist.Ct.App.1988); *Nelson v. Cravero Constructors, Inc.*, 117 So.2d 764, 766 (Fla.3d Dist.Ct.App.1960).

██ The Eleventh Circuit has confirmed this interpretation of good faith by citing *Miles v. Katz* and stating as follows: "A Debtor may convey its assets to a creditor to satisfy its antecedent debts, even if the debtor intended to defeat the claims of other creditors and the creditor had knowledge of such intention.... The transfer becomes fraudulent, however, if the creditor actually participates in the debtor's fraudulent purpose, provided such a purpose exists." *Mission Bay Campland, Inc. v. Sumner Financial Corp.*, 731 F.2d 768 (11th Cir.1984) (citing *Miles v. Katz*, 405 So.2d 750, 751 (Fla.4th Dist.Ct.App.1981)).

The Court in the instant case finds that Levenson participated in the Debtor's fraudulent scheme. Therefore, based on the Eleventh Circuit's standard, the Court finds that she lacked good faith. The Debtor titled the IBF stock in his mother's name. This was clearly an effort to put the Debtor's assets out of the reach of his creditors. Levenson's testimony showed her awareness that the Debtor was not a shareholder in IBF. Nonetheless, Levenson's transfer of $120,000 directly to IBF, instead of to her fiancee, enabled the Debtor to perpetuate this fraud on his creditors and is evidence of Levenson's participation in the Debtor's fraudulent scheme.

Both Levenson and the Debtor testified that the Real Property was transferred to Levenson based on tax advice, and then she quit-claim deeded the Real Property back to the Debtor so that she would not get embroiled in the disputes between the Debtor and his creditors. However, Levenson failed to transfer the Membership back to the Debtor. Upon receipt of the $22,946.73 proceeds from the sale of the Membership, she immediately loaned the funds to IBF, instead of to the Debtor. Again, Levenson's actions aided the Debtor in hiding his assets from his creditors and is evidence of Levenson's participation in the Debtor's fraudulent scheme to remove IBF from the claims of his creditors.

Levenson also testified that she knew the Debtor was having some problems with creditors and she knew that he was trying to reopen a bankruptcy case, even if she was unaware of which bankruptcy case he was trying to reopen. Moreover, the parties were engaged for several years and both testified that their marriage would not take place until all of the Debtor's financial disputes were settled. In a vacuum, one could attribute the transfer of the $120,000 to IBF and the retention of the Membership to naiveté or ignorance on the part of Levenson. However, when coupled with Levenson's knowledge of the Debtor's financial problems and the lending of the proceeds from the sale of the Membership to IBF almost immediately upon her receipt, the Court finds that these acts were knowingly and intentionally undertaken to aid the Debtor's fraudulent scheme to remove IBF from the claims of his creditors. Accordingly, based upon the

Court's review of the totality of the circumstances, the Court finds that Levenson did not act in good faith and that she participated in the Debtor's scheme to defraud his creditors. The defense of § 726.109(1) is not applicable; the Membership was fraudulently transferred under § 726.105(1)(a) and is thus voidable.

### *CONCLUSION*

The Court finds that the Trustee's claims under 11 U.S.C. §§ 548 and 547 are time-barred. The Court further finds that the transfers of $80,000 and $50,000 are proceeds of an exempt asset and thus could not be the subject of a fraudulent conveyance as a matter of law. In addition, the Court holds that the Membership was not fraudulently transferred within the purview of § 726.105(1)(b) and § 726.106(1) because the Debtor received reasonably equivalent value in exchange therefor. The Court also holds that the transfer of the Membership was a fraudulent conveyance under § 726.105(1)(a) because the Debtor had the actual intent to fraudulently transfer the Membership. This determination is based upon the Court's finding of several badges of fraud. The statutory defense under § 726.109(1), raised by Levenson, is inapplicable because the Court finds that she lacked good faith. Accordingly, based upon the preceding findings of fact and conclusions of law, this Court hereby **ORDERS AND ADJUDGES** that:

1. All claims raised under the Bankruptcy Code, 11 U.S.C. §§ 547 and 548, are time-barred.

2. Judgment is entered in favor of Levenson as to all counts regarding the $80,000 and the $50,000 transfers.

3. Judgment is entered in favor of the Trustee with respect to the transfer of the Membership under Florida Statutes § 726.105(1)(a). The transfer of the Membership to Levenson which had a value of $22,946.73 is voidable.

4. Judgment is entered in favor of the Trustee in the amount of $22,946.73, plus interest thereon at the statutory rate from August 7, 1997.

5. This Court retains jurisdiction of this matter for the purpose of entering such other orders as are necessary and proper.

6. The Court shall enter a separate final judgment consistent with this opinion pursuant to Bankruptcy Rule 9021.