## In re WORLD VISION ENTERTAINMENT, INC., Debtor.

**R.W. Cuthill, Jr., Trustee, Plaintiff,**

v.

**Greenmark, LLC; First South Financial Corporation; American Retirement Association; Chadrick Weaver; Greenleaf Marketing Corporation; Dennis Weaver; and Larry Jones, Defendants.**

Bankruptcy No. 99–07440–6J1.
Adversary No. 00–00251.

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

March 29, 2002.

**644**

James R. Leone, New Smyrna Beach, FL, for debtor.

R.W. Cuthill, Jr., Winter Park, FL, trustee.

R. Scott Shuker, Orlando, FL, for trustee.

*AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON TRUSTEE'S COMPLAINT TO RECOVER FRAUDULENT TRANSFERS AND TO PIERCE THE CORPORATE VEIL*

KAREN S. JENNEMANN, Bankruptcy Judge.

The Chapter 11 trustee, R.W. Cuthill, Jr., filed this adversary proceeding against

four corporate defendants asserting that they received fraudulent transfers of brokers' fees totaling $559,515 paid in connection with a Ponzi scheme operated by the debtor. The trustee next seeks to pierce the corporate veil alleging that the three individual defendants are personally liable for the repayment of the fraudulent transfers because they are mere alter egos of the corporate defendants. For the reasons discussed below, judgment in the amount of $569,595.30 is entered in favor of the trustee and against the corporate defendants and one of the individual defendants, Dennis Weaver.

The three individual defendants are Dennis R. Weaver ("Weaver"), his son, Chadrick Weaver ("Chad") (collectively, the "Weavers"), and Weaver's friend and former business partner, Larry H. Jones ("Jones"). The four corporate defendants are companies created, controlled, and operated by Weaver or Jones and include Greenleaf Marketing Corporation ("Greenleaf"), Greenmark, L.L.C. ("Greenmark"), First South Financial Corporation ("First South"), and American Retirement Association, Inc. ("ARA") (collectively, the "Corporate Defendants"). At trial, held on October 15, 16 and November 8, 2001, the trustee withdrew his claims to pierce the corporate veil against Chad and Jones. Therefore, the trustee now seeks to recover the alleged fraudulent transfers only from the Corporate Defendants and Weaver.[1]

The defendants raise several defenses to the trustee's allegations that the brokers' fees they received are fraudulent transfers. They assert that the debtor was operating a legitimate, albeit unprofitable, business and not a Ponzi scheme. The defendants also assert that they acted as independent brokers selling the debtor's nine-month promissory notes for which they earned a fair commission for their services. Because the defendants were not insiders of the debtor, they argue that they had no reason to know the debtor was insolvent, and that they merely received, in good faith, a reasonably equivalent value for their services in the form of commission payments for the notes they sold. Defendants also argue that the trustee's alter ego claims fail because they are not, *per se,* a cause of action and because the trustee failed to allege that Weaver completely dominated and controlled the Corporate Defendants. To untangle the trustee's fraudulent transfer claims and the defendants' good faith defenses, one first must understand the history of the debtor and its operations.

*The Debtor's Nine–Month Promissory Note Sales Program.* Jamie Piromalli formed the debtor, World Vision Entertainment, Inc., as a Florida corporation in 1994. The debtor promoted itself as an entertainment investment company. In 1996, the debtor started selling nine-month promissory notes with annualized interest rates varying between 10.9 and 11.9 percent. Investors could collect their interest monthly or at the end of the nine-month

---

1. In the Second Amended Complaint (Doc. No. 28), the trustee seeks in Counts 1, 4, 8, and 11 to pierce the corporate veil and hold Weaver personally liable for transfers received by the Corporate Defendants. In Counts 2, 5, 6, 9, 12, and 14, the trustee asserts that the debtor made transfers received by the Corporate Defendants with actual fraudulent intent and that the transfers are avoidable pursuant to Florida Statutes 726.105(1)(a) or Sections 548 and 550 of the Bankruptcy Code, 11 U.S.C. 101, *et seq.* In Counts 3, 7, 10, and 13, the trustee asserts that the same transfers received by the Corporate Defendants are constructively fraudulent and recoverable pursuant to Florida Statutes 726.105(1)(b), 726.106(1) and 726.108 and Sections 548 and 550 of the Bankruptcy Code.

term in a lump sum together with their principal investment. Although the notes were unsecured, investors received a certificate of insurance promising full repayment if the debtor defaulted. At the expiration of each nine-month term, the debtor encouraged investors to reinvest their principal for additional nine-month terms.

Between June 1996 and September 1999, the debtor sold nine-month notes totaling approximately $62 million in 33 states to approximately 1,200 investors. The investors typically were elderly people living on a fixed income. They lacked financial sophistication and often invested their retirement savings into the note program relying on the advice of their broker.

The debtor did not directly sell most of the promissory notes. Instead, the debtor actively solicited and recruited a network of brokers, primarily insurance agents, to sell the notes in exchange for a generous commission. Commission rates ranged from 12 to 15 percent. Brokers received a commission payment both when notes were sold and also when notes were renewed. The defendants in this adversary proceeding received commissions averaging 14 percent of the total notes sold.

In order to sell the notes, the debtor had to convince investors that their money would be invested in legitimate ventures. The debtor produced and distributed slick, professional marketing materials touting its business and describing the note program. (Defendants' Exh. Nos. 14–18). The marketing materials either did not discuss or downplayed any risks associated with the notes. (Trustee's Exh. No. 53). Further, to allay concerns or quell any investor anxiety, investors received certificates of insurance allegedly guaranteeing repayment.

Ultimately, the debtor's nine-month promissory note program collapsed. In spring 1999, the debtor defaulted on the note payments. Three years after implementing the note program, on September 3, 1999, the debtor filed its Chapter 11 bankruptcy petition. Approximately $52 million of the notes remain unpaid and outstanding.

*The Trustee's Examination into the Debtor's Promissory Note Program and Investments.* On October 25, 1999, R.W. Cuthill Jr., the plaintiff, was appointed as the Chapter 11 trustee to identify, recover, and distribute assets primarily to unpaid investors. He is a certified fraud examiner and certified public accountant specializing in forensic accounting and is eminently qualified to do this job. Upon his appointment, the trustee assumed control of the debtor's books and records from Seth Miller, an accountant employed by the debtor. The trustee also obtained a database tracking sales of the debtor's promissory notes and completed a thorough review of the debtor's financial history.

Based on his review, the trustee filed this adversary proceeding, along with many others, alleging that the debtor's note program was a massive Ponzi scheme. At trial, the trustee was qualified as an expert in insolvency and testified about the debtor's financial records, business operations, promissory note program, and the quantity and quality of the debtor's investments. The Court finds that the trustee's testimony was convincing, well founded, and credible.

The debtor primarily used monies received from new investors to pay older investors' claims. Other monies were used to fund the exorbitant costs associated with the note program, including the high commissions paid to brokers, such as the Corporate Defendants, to induce the brokers to continue selling the debtor's notes. Officers and directors of the debtor directly withdrew large sums of investor funds.

The debtor used only a small portion of the $62 million received in note proceeds to invest in operating businesses selling actual products or services. The debtor never harbored any realistic expectation of paying the notes in full through profits earned from these investments. Every note sold simply made the debtor even more insolvent.

The trustee offered substantial support for his conclusion that the debtor's primary business was running a Ponzi scheme. For example, the trustee prepared and filed the debtor's tax returns for the years 1996 through 1999. (Trustee's Exh. Nos. 55–58). The returns demonstrate the debtor's continuing financial decline over the four-year period. In 1996, the debtor received $4,703,379 in paid-in capital, primarily through the sale of its promissory notes, and had a retained earnings deficit of $5,396,588, resulting in a $693,209 net shareholder deficit by the end of 1996. (Trustee's Exh. No. 55). In 1997, the debtor received $17,722,504 in paid-in capital, again largely derived from note sales, and incurred a retained earnings deficit of $18,958,682, resulting in a $1,236,178 net shareholder deficit by year's end. (Trustee's Exh. No. 56). In 1998, the debtor received $22,705,837 in paid-in capital from the sale of promissory notes and incurred a retained earnings deficit of $32,142,632, resulting in a $9,436,795 net shareholder deficit by the end of 1998. (Trustee's Exh. No. 57). By 1999, the debtor's retained earnings deficit had increased to $40,730,976, yielding a net shareholder deficit of $18,025,139 at the time the Chapter 11 case was filed. (Trustee's Exh. No. 58).

The trustee also used the debtor's financial records to explain the debtor's sources and uses of funds from 1994 through 1999.

(Trustee's Exh. No. 59). Although the debtor had four sources of funds, the debtor obtained most of its money from note sales. The debtor, through its network of agents, sold approximately $62 million of promissory notes between June 1996, and September 1999.

The other funds received by the debtor during this period are relatively small. In 1994, the debtor received $500 in initial capital. In 1995, the debtor received a total of $159,485 from three private stock offerings as legitimate invested capital. Also in 1995, the debtor received approximately $4,059,796 in loans from insiders. However, of this amount, approximately $4,000,000 was repaid in 1997. Significantly, the debtor received *no* income from the debtor's various alleged business investments.

In addition to examining the debtor's sources of funds, the trustee examined the debtor's use of funds. When the debtor filed this Chapter 11 case, investors were owed about $52 million. Thus, the trustee calculated that, of the approximately $62 million collected from investors, the debtor used approximately $10 million to make interest or principal payments on the notes.

The trustee next analyzed the debtor's larger investments. Between 1994 and 1999, the debtor invested over $17 million in approximately 36 different ventures. Some investments were merely loans. On other investments, the debtor received small amounts of property or stock in exchange for its funds. Four of the debtor's investments exceeded one million dollars. The debtor's single largest investment, the purchase of music and video recordings, spanned a four-year time period and totaled $7,171,520.[2] The debtor never earned any return on these purchases.

---

**2.** The Debtor purchased $4,551,892 of recordings in 1995, $125,250 in 1996, $2,465,379 in

The next largest investment, called Galleon, graphically illustrates the debtor's insiders pilfering investor funds. The Galleon project involved the purchase of the rights to 25 hours of Russian classical music. The debtor's founder, Piromalli, originally purchased the rights using a separate offshore corporation he owned. He paid only $25,000. Piromalli then turned around and sold the same music to the debtor for $4 million. Of the total sales price, Piromalli actually collected $800,000.

The debtor's third largest investment was in a corporation called International Digital Manufacturing, Inc. ("IDIG"), a holding company for subsidiary companies that produced innovative technology products, such as accessories for Palm Pilots. IDIG was a new technology company that required large cash infusions to develop and to market products. Between 1997 and 1999, the debtor invested a total of $3,929,870 in IDIG. The trustee characterized this investment, which appears quite legitimate in many respects, as a part of the "sizzle" that made the debtor's note program appealing to investors.

The debtor's final investment exceeding one million dollars was in a company located in Mexico called MAHZ. Another example of insider transfers, MAHZ was run by the father of one of Piromalli's employees and may or may not have had a legitimate business purpose. The debtor transferred $1.6 million to MAHZ. Piromalli then arranged to retransfer the $1.6 million into his personal bank account in the Isle of Mann.

Many of the debtor's other investments look similarly suspicious. By and large, the debtor's business ventures were shams, vehicles for insider transfers, or woefully undercapitalized start up companies. Given time, luck, and additional capital, IDIG and perhaps some of the other smaller investments could have generated a profit in the future. However, by 1999, not a single one of the debtor's 36 supposedly legitimate ventures resulted in the payment of even one-dollar in profit, dividends, or income to the debtor.

Based on this analysis, the Court accepts the trustee's conclusion that the debtor was insolvent as early as 1996. Each successive promissory note sold acted to increase the debtor's insolvency. The debtor could not have harbored any real hope that its investments would generate the significant yield needed to maintain the note program *and* to pay investors their interest and principal in a nine-month period of time.

The conclusion that the debtor operated as a Ponzi scheme further is confirmed when one considers the high rate of return needed simply to pay the costs associated directly with the promissory notes. Brokers received sales commissions from 12 to 15 percent. Interest rates on the notes ranged from 10.9 to 11.9 percent. The cost for the certificate of insurance guaranteeing the repayment of the notes was approximately 8 percent. Adding these percentages, the debtor needed to generate a return of between 30.90 and 34.90 percent to pay these direct costs associated with the sale of the notes. These costs further do not include any amounts needed to pay rent, salaries, utilities, or other office expenses that would serve only to increase the minimum required rate of return. Yet, although such a high return was needed, the debtor invested in few, if any, legitimate income-producing assets. Rather, the debtor took investors' funds with no intent to repay them.

The debtor's note program was a textbook Ponzi scheme. None of the debtor's

1997, and $28,999 in 1998.

investments ever produced any income or revenue. The debtor's primary source of funds was through the sale of its promissory notes. The debtor used funds invested by new investors to make interest and principal payments to earlier investors. Any remaining funds were used to pay general and administrative expenses such as officer salaries and rent, to make occasional investments in companies not expected to generate any substantial return, and to enrich the debtor's insiders.

Defendants argue that, even if the Court concludes that the debtor operated a Ponzi scheme, they did not know about the scheme when they sold the notes. The defendants assert that the debtor distributed professional marketing materials convincing them of the legitimacy of the debtor's operations and actively concealed the debtor's true financial condition. To determine what these defendants knew or could have known, the Court next must analyze their actions in selling the debtor's notes. Weaver made the decision to sell the debtor's notes and is the key defendant on this issue.

*Weaver's Investigation.* Weaver does not have much formal education. He graduated from high school through a correspondence program. He then entered the army and later worked in the insurance industry for about 30 years. For several years, Weaver worked with Larry Jones at Liberty National Life Insurance. In 1980, the two co-workers went separate ways professionally but remained friends. Between 1983 and 1994, Weaver also owned one or more fast food restaurants while he continued selling insurance part time. His experience in the fast food industry resulted in personal financial troubles and, at some point, he filed an individual bankruptcy case. The only other formal training that Weaver completed was certain real estate courses in 1995 and 1996.

In 1997, Weaver and Jones decided to start a joint venture. They would act as insurance brokers, recruit agents to sell life insurance, and then collect a commission on the agents' sales. They also planned to make some direct sales. Accordingly, in February 1997, the two men formed ARA, a Tennessee corporation, and began their insurance business. (Trustee's Exh. No. 72). Due to Weaver's personal bankruptcy, Chad Weaver, his son, owned 100 percent of ARA's stock.

Shortly after starting ARA, two acquaintances of Jones, Sonny Jordan and Dolphus Broglin, visited ARA's office. Jordan and Broglin worked for the debtor and were trying to find insurance brokers, just like Weaver and Jones, to sell the debtor's notes. Prior to this meeting, Weaver had never heard of, much less sold, similar nine-month promissory notes. Jordan and Broglin pitched the notes stressing the high interest rates and the high commissions earned. They described their success selling the debtor's notes and provided marketing brochures on the debtor's investments. Weaver did not keep the actual brochures he and Jones received on this initial visit and no credible testimony was offered as to the content of these materials. However, the materials probably did discuss New England International ("New England"), a surety company organized in Panama but owned by a holding company in Brussels, Belgium. New England initially guaranteed the repayment of the debtor's notes. (Defendants' Exh. No. 20). After this initial presentation, Weaver never personally spoke with Jordan or Broglin again.

Weaver next spoke by phone with John Belles, Jordan and Broglin's supervisor employed by the debtor. Weaver never met Belles in person. Belles told Weaver

more about the debtor's note program and promised him an even higher commission rate than the rates mentioned by Jordan and Broglin. Weaver found Belles "professional" and "trustworthy."

Weaver and Belles specifically discussed whether the debtor's notes constituted securities subject to registration under state and federal securities laws. Only licensed securities dealers can sell registered securities. Weaver held no securities license and knew he could only sell unregistered securities. Belles provided Weaver with a list of states allowing the sale of the short-term promissory notes without registration. Weaver did not keep this list, but he did introduce a similar list generated much later containing information on various state statutes from late 1998. (Defendants' Exh. No. 21).

Based on this conversation, Weaver knew that the sale of the debtor's notes had legal risks as early as 1997 before he sold a single note. He testified that he personally researched securities law at the local library and concluded that he could legally market the debtor's notes without registering the notes with the Securities Division of Tennessee's Department of Commerce and Insurance (the "TSD") because the notes did not exceed a nine-month term.[3] The Court questions whether Weaver actually completed this research or had the financial sophistication or training to reach this legal conclusion. He certainly never requested a legal opinion from a lawyer supporting his conclu-

sion. He simply trusted someone he talked with by phone.

Weaver took absolutely no action to determine if the debtor was a legitimate business or to assess the debtor's financial condition. He did not request or review any financial statements. He did not perform any independent research or due diligence on the debtor or its notes.

Instead, Weaver completed a cursory investigation into New England's financial status. Weaver testified that, as long as a legitimate insurer guaranteed repayment of the debtor's notes, he did not need any information on the debtor's finances. Accordingly, in August 1997, after Weaver already had started selling the debtor's notes in June or July 1997[4] (Trustee's Exh. No. 86), he received a report from Dun and Bradstreet about New England. The report stated that New England's financial strength was not yet classified but that the company had a good credit appraisal and a Euro-rating of 4AA2, which indicates a rating of "good" or "low risk". (Defendants' Exh. Nos. 7 and 8). Weaver and his band of agents therefore started selling the debtor's notes based upon verbal assurances from the debtor, a look at the debtor's slick marketing brochures, a cursory check on New England, and, possibly, a little legal research. Weaver never made any good faith attempt to ascertain the legitimacy of the debtor, the debtor's business, or the note program.

Moreover, to the extent that Weaver relied on New England's repayment guarantee, his reliance is misplaced because

---

3. Interestingly, Weaver admits he sold notes in amounts less than $50,000. He acknowledged that, when he completed his original research, he learned that Tennessee law only exempted from registration nine-month promissory notes issued in amounts greater than $50,000. Therefore, Weaver's own testimony illustrates that he was not complying with Tennessee securities law.

4. Weaver submitted a $25,000 note *renewal* for a client in March 1998. (Defendants' Exh. No. 71). Because notes were sold with nine-month terms, the original note sale must have taken place in either June or July 1997.

New England did not remain the debtor's surety for long. By the end of 1997, New England had informed the debtor they intended to end any business relationship with the debtor in the near future. In February 1998, a company called Global Insurance Company ("Global") became the "insurer" for the debtor's notes. Global was a St. Kitts corporation doing business in the Bahamas and Costa Rica. At that time, the debtor owned Global. Later, the debtor's officers and other insiders of the debtor acquired ownership of Global. Any pretext of the debtor trying to separate its identity from the surety on the notes was lost when Global replaced New England. Yet, Weaver continued selling the debtor's notes long after New England was no longer involved with the debtor's note program.

More importantly, Weaver never made any effort to investigate Global's creditworthiness, although he was provided with a copy of a summary financial statement in 1998. (Trustee's Exh. No. 65). Weaver never reviewed the terms of the master guarantee between Global and the debtor. The master guarantee is the document that listed the terms of Global's obligation to repay the notes upon the debtor's default. If Weaver had read this document, he would have discovered that Global's obligations terminated on the exact date each note was due. As such, the master guarantee offered no true coverage because no default could ever occur prior to the date the note was due.

Further, even if an investor could make a claim, Global's liability under the master guarantee was limited to a claim against the debtor's assets, which did not exist. Essentially, the debtor insured the repayment of its own notes, and the debtor had no income or assets and no ability to repay the notes. The debtor issued the scam certificates of insurance to induce investors to give the debtor more money. The certificates of insurance made the investment look safe but, in reality, had no substance. Weaver, an experienced insurance agent, should have easily learned of this fraud.

Weaver testified that he evaluated the debtor's promissory notes as he would any insurance policy he sold. He stated that he did not find the commission rates high and was impressed by the information in the brochures supplied by Jordan and Broglin. He repeatedly testified that, in Tennessee, "people believe people." The Court discounts Weaver's professed naivete and finds that Weaver was looking for a new product with high rates of return for his fledgling company, ARA, to sell. Jordan and Broglin arrived at his office at the right time with this new product—the debtor's nine-month promissory note. By and large, Weaver merely accepted the debtor's representations that the debtor's notes were a legal, viable, investment. Weaver's cursory and almost nonexistent investigation indicates that he did not want to know more. He saw the notes promising a high interest earned by investors in a quick period of time and promising high commissions for his agents and himself. He was sold. Weaver simply did not ask any hard questions. He never asked how the debtor was going to earn the 30 percent return needed to pay the notes or whether the underlying certificate of insurance was valid. Weaver did not want to know that the debtor's promises were too good to be true.

*Weaver's Other Corporations and Disregard of Corporate Formalities.* In addition to ARA, Weaver formed three other companies, First South (formerly known as Great Southern Financial), Greenleaf, and Greenmark. Other than a small amount of personal funds used for start-up costs and marketing, none of the companies received

any significant financial or capital contributions. ARA provided employees, office space, and the majority of administrative support for the other corporations.

Weaver and Jones formed First South around the same time ARA was incorporated.[5] Weaver incorporated Greenleaf as a Mississippi corporation about a year later in June 1998. (Trustee's Exh. No. 67).[6] In November 1998, Weaver formed Greenmark as a Delaware corporation with its principal office in Jackson, Tennessee. (Trustee's Exh. No. 69). Both Weavers had a 50 percent ownership interest in Greenleaf and Greenmark. (Trustee's Exh. Nos. 68 and 70).

At trial, the defendants could not consistently identify each corporation's directors and officers. For instance, in some of ARA's corporate documents, Jones was named president, and Chad, Weaver's son, was named secretary. (Trustee's Exh. No. 72). In other records, Chad was listed as president of ARA, and Perry Mullins was listed as ARA's secretary. In reality, Weaver, with the help of Jones in the early years, made all the decisions for ARA regardless of the inconsistent information contained in the corporate records. (Trustee's Exh. No. 73). Similarly, Weaver was the primary decision-maker in the other related corporations. In fact, Chad had very few corporate responsibilities and was ignorant of much of the Corporate Defendants' business dealings. Weaver apparently used Chad's name on corporate documents because he believed that his personal bankruptcy could hurt business.

The Corporate Defendants held few board meetings. The minutes of these meetings reflected no discussion of the debtor's promissory note program, despite the fact that the program generated over $500,000 in revenue. (Defendants' Exh. Nos. 26, 34, 35, 42, 43, and 44).

The Corporate Defendants also ignored corporate distinctions in their financial records and transfers. Monies flowed freely back and forth between the Corporate Defendants. The debtor paid commissions to only two of the Corporate Defendants—First South and Greenleaf. However, all four of the Corporate Defendants deposited the debtor's checks in their various accounts with no apparent pattern, other than Weaver's instructions.

First South received ten commission checks totaling $171,528.37[7] from the debtor for note sales between February 1998 and April 1998. (Trustee's Exh. Nos. 1–10). Only two of the checks were deposited in First South's bank account. The other eight checks were deposited in ARA's bank account.

Greenleaf received thirty-eight commission checks from the debtor totaling $398,066.93 for note sales between May 1998 and April 1999. (Trustee's Exh. Nos. 11–48). Twenty checks were deposited in Greenleaf's bank account, eleven checks were deposited in ARA's account, and four checks were deposited in Greenmark's bank account. The total amount of commissions received by the Corporate Defendants from the debtor is $569,595.30.

---

5. First South was originally incorporated as Great Southern Financial.

6. For some unexplained reason, Articles of Incorporation also were filed for Greenleaf in Nevada on April 5, 1999. (Defendants' Exh. No. 23).

7. The defendants dispute the receipt of one check for $57,616.23. (Trustee's Ex. No. 8). The check was issued by the debtor and is payable to First South. Jones deposited the check in First South's bank account. Therefore, the Court finds that First South received the check.

*State Investigations of Weaver's Business.* Although all four Corporate Defendants deposited these commission payments into their bank accounts, only agents employed by First South and Greenleaf actually sold the notes. Weaver incorporated ARA and First South at about the same time intending that the agents employed by First South would sell the debtor's notes. The first notes were sold no later than July 1997. By April 1998, First South agents in Tennessee had sold notes with a face value exceeding $750,000.

Given the large amount of these unregistered notes sold by unlicensed securities dealers, the Securities Division for the State of Tennessee (the "TSD") began an investigation in April 1998. Jones, Weaver's partner, informed the TSD that, although he believed First South could legally continue to sell the notes, they would voluntarily stop the sales. Weaver argues he was out of the country during April 1998 and had no knowledge of the TSD investigation or his partner's promise to stop the sales. The Court rejects Weaver's claimed lack of knowledge. By April 1998, at the latest, Weaver knew that he could no longer sell the debtor's notes in Tennessee, and, accordingly, he decided to start a new corporation, Greenleaf, which was incorporated in June 1998. By this time, Jones appears to have ended his business relationships with Weaver.

Greenleaf immediately started selling the debtor's promissory notes, now in Kentucky. Soon thereafter, the Securities Division of the Kentucky Department of Financial Institutions (the "KSD") began an investigation into the sales. On December 3, 1998, the KSD wrote a letter to Greenleaf stating that the debtor's notes may constitute securities subject to the registration requirements of the Kentucky Securities Act and that the continued sales of the notes appeared to violate at least two state statutes. (Trustee's Exh. No. 74). Weaver acknowledges receipt of this letter. The KSD also requested a copy of the offering materials used by Greenleaf and a written statement explaining why Greenleaf believed the notes were exempt from registration as securities.

Greenleaf wrote two letters in response to the KSD, one on December 18, 1998, and the other on March 12, 1999. (Trustee's Exh. Nos. 75 and 77). Weaver drafted the letters, although Chad signed the letters at his father's direction. In the first letter, Greenleaf did not offer to stop marketing the notes. However, in the second letter, Greenleaf offered that it already had "made a decision to cease any additional marketing & recruiting activities in the state of Kentucky" prior to the receipt of KSD's inquiry, dated December 3, 1998. (Trustee's Exh. No. 77). The record does not support this position. First, Greenleaf's initial response to the KSD did not mention a prior decision by the company to stop selling the notes. Second, the record indicates that Greenleaf did not decide to stop selling the debtor's notes in Kentucky until December 11, 1998, *after* KSD's initial inquiry was sent. (Defendants' Exh. No. 27). In any event, by December 1998, Weaver knew both First South and Greenleaf could not sell the debtor's notes in Tennessee or Kentucky. Ultimately, both states issued cease and desist orders against Greenleaf, ARA, and First South, permanently enjoining them from the sale of the debtor's notes.[8] (Trustee's Exh. Nos. 81 and 82).

---

8. Specifically, the Tennessee order stated that: 1) ARA was not registered as a broker-dealer; 2) Jones and Weaver "have violated and are violating Tennessee Code Annotated 48–2–109(a) by acting as an unregistered agent of a broker-dealer"; and that, 3) Jones

Weaver certainly knew that the continued sales of the debtor's notes led to legal sanctions.

*The Expert Testimony.* The trustee and the defendants both offered expert testimony on the minimum investigation a broker needed to complete before selling nine-month promissory notes, such as those offered by the debtor. The trustee offered Barclay Sands as his expert. The defendants offered Dennis May, an old family friend, as their expert. Both Mr. Sands and Mr. May have experience in the insurance field. In addition, Mr. Sands holds Series 7 and Series 63 securities licenses and currently investigates and sells securities. Neither expert was experienced in the sale of short-term promissory notes.

Sands testified that brokers selling debt instruments, such as nine-month notes, must review certain key financial information about the issuer prior to recommending any investment. The broker must research applicable investment ratings, such as those published by Moody or Standard and Poor. Critically, brokers should carefully analyze several years of audited financial statements on the issuing company, even if a product is insured. Additionally, the broker should investigate a company's sales history and background information on key employees. Brokers need this information to fully advise clients about an investment's potential risk. Weaver took none of these steps.

Moreover, Sands testified that several aspects of the debtor's note program immediately should have aroused Weaver's suspicions. First, the commissions were very high for a short-term investment. Second, the debtor's marketing materials announce that "demand for a product with this high rate [of interest] may limit how long it will be available." (Trustee's Exh. No. 53). Marketing information for legitimate investments ordinarily do not attempt to create a sense of urgency for the sale. Additionally, the marketing materials failed to disclose the amount of commissions agents received on note sales and renewals or the rate of return needed to repay the notes. Third, a broker making even a cursory financial investigation would review Global's "master guarantee" and learn that any insurance coverage was illusory, at best, as discussed above.

On the other hand, May testified, at least during the trial, that brokers had no obligation to perform any type of financial investigation prior to selling short-term promissory notes. (At his earlier deposition, May testified differently, stating that such a broker, at a minimum, needed to review the company's financial statements, review literature about the company, and find the company's financial ratings.) He followed his own maxim by selling the debtor's notes to members of his own family relying solely on Weaver's recommendation. May completed no due diligence of the debtor or the debtor's notes. He simply trusted an old friend, Weaver. May has never sold any other security or any other type of debt instrument even vaguely resembling the debtor's notes. May, an elderly gentleman, is an experienced insurance agent who lacks any knowledge of the securities industry but was trying to help out his friend. The Court rejects May's testimony.

The Court accepts Sand's testimony that any broker selling short-term promissory notes, even unregistered promissory notes such as the debtor's notes, has a minimal duty of care owed to investors. Before selling the notes, the broker must review

and Weaver "have violated and are violating Tennessee Code Annotated 48–2–104 by sell- ing an unregistered security." (Trustee's Exh. No. 82, p. 5).

available investment ratings from qualified financial rating services. The broker must request and review with a critical eye audited financial statements of the company as well as other literature provided by the company discussing its sales history and the background of key employees. A broker cannot rely only on slick, marketing brochures or insurance coverage, refrain from asking hard questions about the legitimacy of the product, and then assume a proper investigation was completed. In some cases, other types of investigation may be merited. However, unless these minimal steps are taken, a broker selling a short-term promissory note is not performing the minimum standard of care required throughout the United States.

*The Commission Payments are Fraudulent Transfers.* The trustee alleges that the commission payments made by the debtor to the Corporate Defendants totaling $569,595.30 are avoidable as actually or constructively fraudulent. The trustee seeks to recover those transfers from Weaver pursuant to Bankruptcy Code, 11 U.S.C. 548(a), and Florida Statutes Sections 726.105(a) and (b), 726.106(1), and 726.108.

The defendants deny the trustee's allegations. They assert that, even if trans-fers are deemed fraudulent conveyances, the transfers are not avoidable under Section 548(c) of the Bankruptcy Code and Florida Statute Section 726.109(1) because the defendants gave reasonably equivalent value and acted in good faith. *In re Goldberg,* 229 B.R. 877, 886 (Bankr. S.D.Fla.1998). To resolve these issues, the Court first will address whether the commission payments are avoidable fraudulent transfers and second decide whether the defendants can rely on the defense of good faith.

■ To avoid transfers made with either actual or constructive fraud under 548(a)[9], a party must prove by a preponderance of the evidence that the debtor transferred an interest in property on or within one year prior to the filing of the petition for relief. *In re Model Imperial, Inc.,* 250 B.R. 776, 790–791 (Bankr. S.D.Fla.2000) (*citing Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). Under Florida law and Florida Statutes Sections 726.105 and 726.106, the provisions are very similar but the reach back period to recover avoidable transfers is extended to four years.

The debtor paid First South $171,528.37 and paid Greenleaf $398,066.93 between

---

9. Section 548 provides, in pertinent part, as follows:

§ 548. Fraudulent transfers and obligations

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

June 23, 1997, and April 27, 1999. (Trustee's Exh. Nos. 1–48). The payments constitute transfers of the debtor's property made within four years of the date this Chapter 11 case was filed, on September 3, 1999. The only remaining question is whether the trustee can prove the other elements necessary to demonstrate that the transfers were actually or constructively fraudulent.

■ To prove *actual* fraud, the only additional element the trustee must prove is that the debtor made the transfers with the actual intent to hinder, delay, or defraud a creditor or prospective creditor. The answer is unquestionably, yes. Given the difficulties in establishing a transferor's actual intent, courts generally look at the totality of the circumstances and the badges of fraud surrounding the transfers. *Model Imperial*, 250 B.R. at 790–791 (*citing In re XYZ Options, Inc.*, 154 F.3d 1262, 1275 (11th Cir.1998) (*internal citations omitted*)). "While a single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance . . . several of them when considered together may afford a basis to infer fraud." *In re Goldberg*, 229 B.R. 877, 885 (Bankr. S.D.Fla.1998) (discussing avoidable transfers under Florida Statute 726.105) (*citing General Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1498 (11th Cir.1997)).

In cases involving a Ponzi scheme, the analysis is simplified because fraudulent intent is inferred. *Merrill v. Abbott (In re Independent Clearing House Company)*, 77 B.R. 843, 860 (D.Utah 1987). The District Court for the Central Division of Utah offers an insightful analysis of a debtor's intent where the debtor operated a Ponzi scheme:

> One can infer intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf.* Restatement (Second) of Torts § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)*, 14 B.R. 637, 643 (Bankr.D.Kan.1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1)).

*Id.* at 860.

■ A Ponzi scheme is by definition fraudulent. By extension, any acts taken in furtherance of the Ponzi scheme, such as paying brokers commissions, are also fraudulent. Every payment made by the debtor to keep the scheme on-going was made with the actual intent to hinder, delay, or defraud creditors, primarily the new investors.

The evidence demonstrates that the debtor's note program was a textbook Ponzi scheme. None of the debtor's investments ever produced any income or revenue. The debtor's primary source of funds was through the sale of its promisso-

ry notes. The debtor used funds invested by new investors to make interest and principal payments to earlier investors. Any remaining funds were used to pay general and administrative expenses such as officer salaries and rent, to make occasional investments in companies not expected to generate any substantial return, and to enrich the debtor's insiders. The debtor recruited insurance agents to sell its promissory notes and paid the brokers commissions, such as those received by the Corporate Defendants in this adversary proceeding, to perpetuate the scheme. Without the brokers, the scheme would have collapsed much earlier. The debtor paid the brokers high commissions to induce them to continue the sales and to keep the cash flowing in. Without question, the debtor paid these commissions with the actual intent to defraud both current and future investors. As such, the trustee has proven by a preponderance of the evidence that the transfers were made with *actual* fraud and are avoidable under Section 548 of the Bankruptcy Code and Florida Statutes Section 726.105.

■ To demonstrate *constructive* fraud, the trustee must prove that the debtor was insolvent at the time the transfer was made and received less than reasonably equivalent value in exchange for the transfer. *See In re XYZ Options, Inc.,* 154 F.3d 1262, 1275 (11th Cir.1998). Here, the debtor clearly was insolvent at least as early as 1996. This insolvency increased with each successive note sold. Therefore, the remaining issue is whether the debtor received reasonably equivalent value in exchange for the payment of the broker commissions.

The court holds that the debtor did receive reasonably equivalent value adopting, in part, the reasoning of the Bankruptcy Court for the Southern District of New York in *In re Churchill Mortgage Invest-*

*ment Corp.,* 256 B.R. 664 (Bankr.S.D.N.Y. 2000). The trustee in that proceeding similarly sought to recover broker commissions paid by a debtor operating a Ponzi scheme. There, as here, the trustee argued that, even though the amount of the commissions were reasonable, the commissions, *in toto* and as a matter of law, failed to provide reasonably equivalent value simply because the commissions were paid by an entity engaged in a Ponzi scheme. *Churchill,* 256 B.R. at 674. Significantly, the trustee did not argue that the brokers acted improperly, in bad faith, or had knowledge of the Ponzi scheme. The brokers received their normal fee for their usual services. The rub is that the payment came from a debtor operating a Ponzi scheme.

■ In *Churchill,* the key inquiry was whether the brokers provided the debtor with reasonably equivalent value for the commissions they received. Courts must assess value on a case-by-case basis looking at the surrounding circumstances and focusing on the precise transfer in question and not on the value of the transfer to the debtor's overall fraudulent enterprise.

> [T]he statutes and case law do not call for the court to assess the impact of an alleged fraudulent transfer in a debtor's overall business. The statutes require an evaluation of the specific consideration exchanged by the debtor and the transferee in the specific transaction that the trustee seeks to avoid, and if the transfer is equivalent in value, it is not subject to avoidance under the law.

*Id.* at 680.

In looking at the value provided for each individual transfer, or commission payment, rather than the value provided to the enterprise overall, the Bankruptcy Court held that the brokers were performing their usual jobs for roughly their usual rates. The debtor received the benefit of

its bargain—the sale of a mortgage, albeit a fraudulent one, in exchange for the payment of a reasonable commission. As such, the Court concluded that the debtor had received reasonably equivalent value.

In this case, brokers also sold the debtor's notes and received a commission. Every time a broker sold a note, the defendants remitted the entire proceeds to the debtor. The debtor, in turn, paid the broker a commission based on the face amount of the note sold or renewed. The commission rate averaged 14 percent. Although this commission rate was high, the trustee does not assert that a lower rate was appropriate. Rather, the trustee argues the payment of *any* commission amount is constructively fraudulent because the debtor received no value for the brokers' services.

The Court rejects the trustee's theory. The debtor received exactly what it wanted—the sale of more and more notes. The debtor paid high commission rates to the brokers to encourage the sales. Without the new sales, the debtor's Ponzi scheme would have collapsed earlier. Therefore, the brokers, including the defendants in this adversary proceeding, performed a valuable service for the debtor. The debtor paid proportionate commissions for these services, and the trustee failed to prove constructive fraud because the debtor received reasonably equivalent value.

Simply because a debtor conducts its business fraudulently does not make every single payment by the debtor subject to avoidance. If so, every vendor supplying goods to the debtor would receive an avoidable fraudulent transfer when the debtor paid the vendor's invoice. Every employee, even lower-level custodial and clerical employees, would be required to return their wages, regardless of the work they performed. Landlords would have to return rent payments, even if the debtor actually occupied the leased premises. No one conducting business with a debtor operating a Ponzi scheme could prevent the avoidance of payments they received from the debtor, regardless of the extent of the transferee's knowledge or culpability or the actual services provided. The law does not require this result.

As discussed above, *all* payments made by a debtor in furtherance of a Ponzi scheme are made with actual fraudulent intent. Some of these payments are properly avoidable; others are not. None are automatically avoidable. Courts must assess the good or bad faith of each recipient to determine which are avoidable and which are not. This good faith defense is contained in Section 548(c) of the Bankruptcy Code and Florida Statutes Section 726.109(1). These statutes provide that a recipient of a fraudulent transfer need not return the property received if the transferee gave value and acted in good faith. Recipients who rely on this defense bear the burden of proving their own good faith. *See In re M & L Business Machine Co.*, 84 F.3d 1330, 1338 (10th Cir.1996); *In re National Liquidators*, 232 B.R. 99 (Bankr.S.D.Ohio 1999). All recipients of avoidable transfers from a debtor operating a Ponzi scheme are entitled to raise good faith as a defense.

Courts will determine whether the good faith defense is established by looking at the actions and knowledge, both actual knowledge and imputed knowledge, of the recipient. Some recipients, such as insiders directly running the Ponzi scheme, obviously could not demonstrate good faith because of their involvement in the enterprise and their actual knowledge of the fraud. Other recipients, such as third party vendors and landlords, probably can demonstrate good faith with relative ease. These types of recipients only deliver goods or rent buildings and have

no reason and, more importantly, no duty to inquire into the nature of the debtor's business. Many employees likely would fall into this category. However, in the event any of these normally disinterested recipients *did* have knowledge of the debtor's Ponzi scheme and was acting to further the fraud, they would forfeit the protection of the good faith defense.

The issues raised in this adversary proceeding present a middle ground, a third type of recipient—brokers who sell the debt instruments that allow a Ponzi scheme to continue. The brokers' sole job is to sell these fraudulent notes or mortgages to investors. The brokers often have long-term relationships with their clients. The clients usually are elderly and financially unsophisticated. The clients rely on the brokers for financial advice. Therefore, the issue is whether these brokers act in good faith if they make no or little effort to verify the legitimacy of the debt instruments they market. Stated differently, can a broker simply rely on promises made by a dishonest and fraudulent debtor and still act in good faith?

■■■ Good faith is not a precise, defined term. Good faith is judged using an objective standard. *See In re M & L Business Machine Co.*, 84 F.3d at 1337–39 (good faith should be measured using an objective standard which examines whether circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose); *Hays v. Jimmy Swaggart Ministries, et al.*, 263 B.R. 203, 211 (M.D.La. 1999) ("Good faith is determined on a case-by-case basis using an objective standard ..."); *but see Independent Clearing House Co.*, 77 B.R. at 862 (good faith is a subjective question).

■■■■ A party can rebut the § 548(c) good faith defense by showing that the recipients of the avoidable transfer had knowledge or notice of the debtor's financial difficulties or fraudulent purpose. "[C]ourts look to what the transferee objectively 'knew or should have known' rather than examining what the transferee actually knew from a subjective standpoint." *In re Agricultural Research & Technology Group, Inc.*, 916 F.2d 528, 535–36 (9th Cir.1990). "[I]f the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and *diligent* inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent." *Id.* at 536 (*citing In re Polar Chips Int'l, Inc.*, 18 B.R. 480 (Bankr.S.D.Fla.1982)). "[A] transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency." *In re Sherman*, 67 F.3d 1348, 1355 (8th Cir.1995). Further, "a transferee may not remain willfully ignorant of facts which would cause it to be on notice of a debtor's fraudulent purpose," *Model Imperial*, 250 B.R. at 798, and then "put on 'blinders' prior to entering into transactions with the debtor and claim the benefit of 548(c)." *In re Cannon*, 230 B.R. 546, 592 (Bankr.W.D.Tenn.1999) (*rev'd on other grounds*, 277 F.3d 838 (6th Cir.2002)).

Finding that an objective standard is appropriate to use in judging good faith, the Court first must define the steps a prudent broker acting in good faith would take before selling the debtor's notes. Then, the Court must determine if the defendants took these steps. Sands, the trustee's expert, convincingly testified that any broker selling short-term promissory notes, such as the debtor's notes, has a duty to conduct a reasonable investigation into the legitimacy of the notes. The exact steps a broker must take to complete a reasonable investigation will vary from case to case, depending on the circumstances and the type of note sold. Howev-

er, as a general rule, before selling the notes, a reasonable broker must review available investment ratings from qualified financial rating services. The broker also must request and review with a critical eye audited financial statements of the company as well as other literature provided by the company discussing its sales history and the background of key employees. A broker cannot rely only on slick, marketing brochures or insurance coverage, refrain from asking hard questions about the legitimacy of the product, and then assume a proper investigation was completed. In some cases, other types of investigation may be merited. However, unless these minimal steps are taken, a broker selling a short-term promissory note is not performing the minimum due diligence required throughout the United States.

None of the defendants completed these steps. Weaver took absolutely no action to determine if the debtor was a legitimate business or to assess the debtor's financial condition. He did not request or review any financial statements. He did not perform any independent research or due diligence on the debtor or its notes. He did not request a Dun and Bradstreet report or determine whether any other rating agency had evaluated the debtor.

Instead, Weaver completed a cursory investigation into New England's financial status. Weaver testified that, as long as a legitimate insurer guaranteed repayment of the debtor's notes, he did not need any information about the debtor. No prudent broker would rely on this limited information. However, even if a prudent broker could substitute an investigation of a debtor's insurer for an investigation into the debtor's financial condition, Weaver completed a woefully inadequate investigation. After Weaver had started selling the debtor's notes, he received a report from Dun and Bradstreet about New England. The report stated that New England's financial strength was not yet classified but that the company had a good credit appraisal and a Euro-rating of 4AA2, which indicates a rating of "good" or "low risk". (Defendants' Exh. Nos. 7 and 8). The defendants completed no further inquiry. They did not review financial statements. They did look at the underlying insurance policy. When Global replaced New England as insurer in February 1998, the defendants made no investigation into this new insurer. For example, the defendants did not review the master guarantee, which, if read, clearly indicated the coverage was illusory, at best. For someone professing to rely solely on such insurance coverage, the defendants did little to assess the likelihood insurance coverage actually existed to pay investors' claims.

The fact that the defendants took these few steps does indicate, however, that they knew they needed to perform *some* type of due diligence inquiry. They just did not want to ask too many questions because they did not want to know too much. Weaver primarily accepted the debtor's representations that the debtor's notes were a legal, viable, investment. He saw the notes promising a high interest earned by investors in a quick period of time and promising high commissions for his agents and himself. Weaver did not inquire further.

The defendants did not perform the minimal due diligence steps needed to demonstrate that they acted in good faith. They sold the debtor's notes on faith after an inadequate investigation. If the defendants had completed any true investigation, the defendants quickly would have learned of the debtor's insolvency, the debtor's lack of legitimate business, the utter lack of true insurance guaranteeing the repayment of the notes, and the fraudulent nature of the notes.

The defendants argue that they did not know how to complete the required due diligence because they are financially unsophisticated and had never previously sold promissory notes. This argument actually negates rather than supports their good faith defense. Weaver knew he and his brokers were not licensed to sell securities. He knew he was not familiar with this type of product—short-term promissory notes. He knew he did not know about the legal restrictions or rules restricting their sale. Indeed, Weaver testified that he went to the library to research the state law on this issue. Yet, even in light of this professed ignorance, he continued to sell the debtor's notes.

Any reasonable person would have verified the rules and regulations relating to the sale of the notes and the due diligence requirements *before* they started selling the notes. Given that good faith is determined using an objective standard and that no reasonable person would have proceeded in a manner similar to the defendants without completing the requisite due diligence, Weaver's excuse that "he didn't know better" merely establishes ignorance, not good faith. No reasonable broker would have sold the debtor's notes based on these defendants' investigation. Therefore, the court concludes that the defendants did not prove that they acted in good faith. All payments they received from the debtor are avoidable fraudulent transfers.

The last issue is whether Weaver is personally liable for the return of the avoidable transfers—the commission payments. The trustee has waived any claim to impose personal liability on the other individual defendants, Mr. Jones and Chadrick Weaver. The trustee maintains, however, that he is entitled to pierce the corporate veil and to get a personal judgment against Weaver.

*Piercing the Corporate Veil.* Both First South, incorporated in Tennessee, and Greenleaf, incorporated in Mississippi, received commission payments directly from the debtor. These defendants then shared the funds indiscriminately with the two other Corporate Defendants. Weaver individually did not directly receive any payment. The trustee argues the corporate veil shielding Weaver from individual liability should be pierced because he disregarded the corporate identities and used the businesses for improper purposes.

The decision whether to pierce the corporate veil is a question of state law. *Realmark Inv. Co. v. American Financial Corp.*, 171 B.R. 692, 694 (N.D.Ga. 1994). Because the debtor filed this Chapter 11 case in Florida, the court first must look to Florida's choice of law rules to determine which state's law to apply. *Digioia v. Koch & Sons, Div. of Wickes Man. Co.*, 944 F.2d 809, 812 (11th Cir.1991); *Bishop v. Florida Specialty Paint Co.*, 389 So.2d 999 (Fla.1980).

Florida courts look to factors listed in the *Restatement (Second) Conflict of Laws* (1971) to determine which law to apply. *See Digioia*, 944 F.2d at 812 (courts must apply Section 145 of the *Restatement* because Florida lacks a "statutory directive . . . on choice of law"). Section 145 directs courts to consider these factors: (1) the local law of the state having the most significant relationship to the issue and to the parties; (2) the place where the injury occurred; (3) the domicile, place of incorporation, and the place of business of the parties; and (4) the place where the relationship between the parties is centered.

Applying these factors to this case, the court will apply the law of Tennessee and Mississippi to the trustee's veil piercing claims. First South and Green-

leaf were incorporated in those states. The debtor's notes were sold primarily in those states, and the unpaid investors generally reside in those states. Furthermore, Section 307 of the *Restatement* governs shareholder's liability and specifically provides that "[t]he local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to the corporation for assessments or contributions and to its creditors for corporate debts." *See also Realmark Inv. Co.*, 171 B.R. at 695 (holding that the law of the state of incorporation applies).

■■■■ In Tennessee, a legal presumption exists that a corporation is a distinct legal entity, separate from its shareholders, officers and directors. *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn.Ct. App.1991). However, the "owners of a corporation may be held liable and the corporate entity 'may be disregarded upon the showing of special circumstances such as, that the corporation is a sham or a dummy so that failure to disregard it would result in an injustice.' " *Durham v. Dormer Enterprises, Inc.*, 1992 WL 97075, at *7 (Tenn.Ct.App. May 12, 1992) (*quoting Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn.1985)). The party seeking to negate the separate existence of the corporate entity has the burden of proving sufficient facts to justify the piercing of the corporate veil. *Schlater*, 833 S.W.2d at 925. Tennessee courts examine factors such as the sole ownership or domination of the corporation by one individual, the use of the same office or business location, the employment of the same employees, the use of the corporation as an instrumentality or business conduit for an individual or another corporation, and the diversion of corporate assets by or to a stockholder or another entity. *Ki-*

*nard v. Cook*, 1991 WL 27378, at *4 (Tenn. Ct.App. March 6, 1991) (*citing Federal Deposit Ins. Corp. v. Allen*, 584 F.Supp. 386, 397 (E.D.Tenn.1984)). In all cases, the person seeking to pierce a corporate veil must demonstrate fraud or use of the corporation for an improper purpose. *IBC Mfg. Co. v. Velsicol Chem. Corp.*, 187 F.3d 635, 1999 WL 486615, at *4 (6th Cir. July 1, 1999); *Schlater*, 833 S.W.2d at 926; *Anderson v. Durbin*, 740 S.W.2d 417, 418 (Tenn.Ct.App.1987); *Electric Power Bd. of Chattanooga*, 691 S.W.2d at 526.

■■■■ In Mississippi, a similar presumption exists. A corporation possesses a separate identity from its shareholders, whether such shareholders are individuals or corporations. *FMC Finance Corp. v. Murphree*, 632 F.2d 413, 421 (5th Cir. 1980). Mississippi law allows a court to ignore this separate corporate identity to defeat a fraud, wrong or injustice, at least where the rights of third persons are concerned. *Kramer v. Keys*, 643 F.2d 382, 385 (5th Cir.1981). "The corporate veil should not be 'pierced' unless the corporation exists to perpetrate a fraud or is a mere instrumentality, agent, adjunct, or sham designed to subvert the ends of justice." *North American Plastics, Inc. v. Inland Shoe Mfg. Co., Inc.*, 592 F.Supp. 875, 877–78 (D.N.D.Miss.1984) (*citing Johnson & Higgins of Mississippi, Inc. v. Commissioner of Insurance of Mississippi*, 321 So.2d 281, 285 (Miss.1975)).

In this adversary proceeding, the trustee has proven that Weaver absolutely controlled and dominated each of the four Corporate Defendants. He transferred funds between them at his pleasure and without any demonstrated corporate purpose. The Corporate Defendants used the same employees and offices. Even the principals could not identify the separate officers and directors of the various defendants. All the testimony supports the

finding that Weaver was the primary, if not exclusive, decision-maker for all four corporations. Weaver used the companies as conduits or instrumentalities to conduct his personal business. Weaver is the alter ego of the Corporate Defendants.

Weaver also used the corporate entity for a fraudulent or improper purpose—the sale of the debtor's notes. As discussed at length above, Weaver organized his brokers to aggressively market the debtor's notes without making any investigation into the legitimacy of the notes. He created the corporate entities specifically to sell these notes or to process the broker's commissions received from the debtor. The corporations' primary purpose was to facilitate the sale of the debtor's notes. Weaver knew or should have known that the debtor had no ability or intention to repay the notes sold. Weaver was an active participant in the debtor's fraudulent enterprise. Certainly, many creditors, primarily investors, were injured as a direct result of Weaver's actions. As such, the trustee has proven each of the elements necessary to pierce the corporate veil. Weaver is individually liable for the return of the commission payments in the amount of $569,595.30.

*Conclusion.* The trustee has proven that the debtor made the commission payments to the defendants with actual fraudulent intent. Although the defendants established that they gave reasonably equivalent value in exchange for the commission payments and the trustee, therefore, was unable to prove constructive fraud, the defendants failed to establish that they received the payments in good faith. Accordingly, judgment is entered in favor of the trustee and against the Corporate Defendants on the actual fraud counts in the following amounts: First South $171,528.37 and Greenleaf $398,066.93. The trustee also has established that he is entitled to pierce the corporate veil. The court shall enter a judgment against Weaver individually in the amount of $569,595.30. A separate judgment consistent with these Findings of Fact and Conclusions of Law shall be entered.